**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Christopher HALL, Defendant-Appellant.**

**No. 80–3699.**

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 20, 1981.

---

Julian R. Murray, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U. S. Atty., Michael Schatzow, Harry W. McSherry, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

Christopher Hall was tried to a jury on charges of conspiring to distribute and to possess with intent to distribute cocaine (Count I), possessing with intent to distribute cocaine (Count II), and distributing cocaine (Counts III and IV), in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2. He was convicted of conspiracy and distribution (Counts I, III, and IV) and sentenced to ten years' imprisonment with nine years and nine months suspended and a five year term of probation.

Hall now appeals his convictions, arguing (1) that the trial court erred in denying his pretrial motion for a bill of particulars, (2) that the trial court unduly restricted the scope of his cross-examination of the key witnesses against him, and (3) that the trial court erroneously admitted irrelevant and prejudicial testimony.

Because we agree that the court below erred in admitting irrelevant and highly prejudicial opinion testimony by an agent of the federal Drug Enforcement Administration (DEA), we reverse the convictions and remand the case to the district court for a new trial.

## I.

The government's case at trial rested primarily upon the testimony of Hall's alleged coconspirators, James Worthy, Jack Beck,

and Debbie Ryan, all of whom testified under the auspices of plea bargaining agreements with the government. This testimony was uncorroborated by physical evidence—the government had made no "controlled buy" or seizure of cocaine in connection with any of the transactions covered in the indictment.

Hall stood silent at his trial. The theory of his defense was that the three key government witnesses, in an effort to reap the benefits of cooperation with the government and at the same time to protect their true source of supply, offered him up to federal prosecution as a convenient scapegoat. In support of this theory, Hall sought to impeach the credibility of the witnesses against him by bringing out the details of their plea agreements with the government, their relationships to one another, and their other potential motivations for lying, and by stressing the total absence of any corroborating physical evidence to support their version of the facts.

To bolster its case, the government called its final witness, DEA agent John Donald. Donald did not participate in the investigation leading to Hall's arrest and prosecution, and was in no way connected with the development of the case against Hall. The sole purpose of his testimony was to respond to defense counsel's suggestion that the government had been unable to obtain corroborating physical evidence against Hall because Hall was innocent of the offenses charged. Donald testified in general terms about the various procedures used by the DEA in its narcotics investigations. In sum, Donald described the various investigative techniques and testified that it is not always possible to conduct a "controlled buy" and seizure of narcotics during the course of an investigation, particularly where the conspiracy under investigation has already terminated by the time the investigation is commenced or the subject of the investigation is insulated in the higher echelons of the narcotics conspiracy.

Hall's strenuous objections to this line of testimony were overruled by the district court. On appeal, Hall renews those objections, contending that the testimony of agent Donald should have been excluded as irrelevant or, if relevant, as unfairly prejudicial.

We must agree.

■ The essential prerequisite of admissibility is relevance. Fed.R.Ev. 402. To be relevant, evidence must have some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* 401. Implicit in that definition are two distinct requirements: (1) The evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one·that is of consequence to the determination of the action. McCormick on Evidence § 185, at 435 (2d ed. 1972); 1 Weinstein's Evidence ¶ 401[03], at 401–13 (1980); 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5162, at 18 (1978). Whether a proposition is of consequence to the determination of the action is a question that is governed by the substantive law. Simply stated, the proposition to be proved must be part of the hypothesis governing the case—a matter that is in issue, or probative of a matter that is in issue, in the litigation. McCormick on Evidence, *supra*, § 185, at 434; 1 Weinstein's Evidence, *supra*, ¶ 401[03].

In this light, we have little difficulty concluding that agent Donald's testimony was improperly admitted.

■ The governing hypothesis of any criminal prosecution consists of the elements of the offenses charged and the relevant defenses (if any) raised to defeat criminal liability. *Cf.* 1 Weinstein's Evidence, *supra*, ¶ 401[03] at 401–11.[1] As characteriz-

---

1. To paraphrase Weinstein, 1 Weinstein's Evidence, *supra*, ¶ 401[03] at 401–11, every criminal prosecution is governed by a rule of substantive law which may be stated in conditional form, as follows:

If [Element one] and [Element two] and [Element three] ... (etc.) ... then the defendant's conduct was criminal, and he is punishable, unless [Defense one] or [Defense two] or [Defense three] ... (etc.).

ed by the government, Donald's testimony was offered to show that the DEA routinely utilized procedures other than the controlled buy and seizure method in order to develop criminal narcotics cases. In essence, Donald testified as a kind of quasi-expert on DEA investigative procedures, and his testimony was limited to the general and quite hypothetical descriptions of accepted practice that are typical of the expert witness. He testified to no facts bearing on any manner on the prosecution of Christopher Hall or on the investigation leading to that prosecution. His testimony had no tendency whatsoever to make the existence of any fact of consequence to the government's case in chief either more or less probable than it would have been without his testimony. *See* Fed.R.Ev. 401. Clearly, then, in the context of the government's case in chief, agent Donald's opinion testimony lacked substantial relevance to any matter in issue, and was therefore not admissible. *See id.* 402.

The government, however, does not seriously contend that Donald's testimony was relevant and admissible in the context of the issues to be proved in its case in chief. It argues, rather, that DEA investigative methodology was properly at issue in this case because the defense had placed it at issue. Specifically, the government contends that the defense "opened the door" to this testimony and entitled the government to its "fair response" by arguing to the jury that the only procedure used by the DEA in making criminal narcotics cases was the controlled buy and seizure method, and by eliciting from government witness Debbie Ryan on cross-examination the fact that she had been arrested during the course of a controlled buy.

We find no merit in these contentions. ■ The defense did not place DEA investigative procedures in issue in this case. Pretermitting considering of whether a matter can be placed in issue solely by virtue of the arguments of counsel, we note that defense counsel did not make the argument described by the government. In its opening and closing remarks to the jury,

reproduced in pertinent part in the appendix to this opinion, the defense did no more than stress the total absence of corroborating physical evidence and the resulting weakness in the government's case. Such remarks are entirely proper and do not, in our view, suggest that controlled buys are the *exclusive* investigative procedure utilized by the DEA. Nor did the cross-examination of Debbie Ryan place this matter in issue. Ryan was asked whether any federal agents were involved in the undercover work leading to her arrest. After a lengthy bench conference on the relevance of this question, see the appendix, *infra*, Ryan responded in the affirmative. This rather narrow line of interrogation, taken on cross-examination of a government witness, does not to place in issue the matters testified to by agent Donald.

Indeed, we are offered no theory under which this testimony might be admitted.

By citing us to references to the right of rebuttal contained in *United States v. Sadler*, 488 F.2d 434, 435 (5th Cir.), *cert. denied*, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974), the government suggests an argument that agent Donald's testimony was properly admitted as rebuttal evidence. Assuming *arguendo* the propriety of both the characterization and the admission of anticipatory rebuttal evidence in the government's case in chief, we nevertheless conclude that such evidence was not properly admissible in this case.

■ As this circuit has noted, the purpose of rebuttal testimony is "to explain, repel, counteract, or disprove the *evidence* of the adverse party." *United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978) (emphasis added). The underlying rationale is that when the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution's accepting the challenge and attempting to rebut the proposition asserted. *Id.* This case does not fall within that rationale. *Delk* suggests the reason:

On appeal, . . . the question boils down to whether the tag receipts were properly admitted in rebuttal.

In our analysis of this problem we do not consider the favorable testimony which defense counsel had elicited on cross-examination of government witnesses. This is so because it is well settled that the purpose of rebuttal testimony is "to explain, repel, counteract, or disprove the *evidence* of the *adverse* party" .... (Emphasis supplied.)

*United States v. Delk, supra*, 586 F.2d at 516. In this case, the defense presented no evidence. There was, consequently, nothing for the government to rebut.

■■■ More directly, the government asserts that agent Donald's testimony was properly admitted under the aegis of the "fair response" doctrine recognized by this circuit in *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir. 1978). We do not agree. As enunciated by this circuit, the doctrine of fair response entitles the prosecution, in its *argument* to the jury, to make a fair response to the statements made by the defense in its jury *argument*. *See, e. g., United States v. Hiett, supra*, 581 F.2d at 1204; *United States v. Bursten*, 453 F.2d 605, 608–11, 610 n.6 (5th Cir, 1971), *cert. denied*, 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972). We are cited to no case, and we find none among the multitude of cases recognizing the doctrine, that would extend the prosecution's right to a fair response to include the presentation of evidence. If the prosecution thought that the argument of defense counsel was improper, its remedy was to seek curative instructions from the court.

■■■ The final possibility involves the concept of "curative admissibility." *See* 1 Wigmore on Evidence § 15 (3d ed. 1940). Under this concept, evidence that is, irrelevant and thus inadmissible nevertheless may be admitted to rebut evidence of a like character. *See* McCormick on Evidence, *supra*, § 57. The rationale underlying the doctrine of curative admissibility is concisely stated by McCormick:

> [M]ost of the courts seem to say generally that "one who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of the opening."

McCormick on Evidence, *supra*, § 57, at 132 (footnote omitted). We have already noted, above, that there was no defense *evidence* as to the issue, admissible or inadmissible, presented in this case. Hence, there was nothing for the government to rebut.

■■■ We conclude, therefore, that the testimony of the DEA agent John Donald lacked substantial relevance to any matters in issue in this case and was improperly admitted. That error was not harmless. The agent's "expert" generalities about the difficulty of making controlled buys and seizures of narcotics from individuals insulated in the higher echelons of drug conspiracies clearly and improperly suggested to the trial jury—in the absence of any substantial evidence to that effect—that Christopher Hall was just such a high-ranking conspirator. The risk of unfair prejudice inherent in such damning generalities—alone enough to warrant reversal, *see* Fed. R.Ev. 403—is exacerbated by the nature of the testimony itself. Reduced to its essentials, Donald's testimony constituted little more than a (quasi-) expert commentary on the strength of the government's proof. Its sole purpose was to inform the jury that it need not view the absence of corroborating physical evidence as a weakness in the government's case. Such "evidence" has no place in a criminal trial.

## II.

Having found reversible error in the admission of DEA agent John Donald's testimony, we need not—and do not—resolve the remaining issues raised by appellant Hall on this appeal. Because the case must be remanded to the district court for a possible new trial, however, we would take brief note of Hall's contention that his cross-examination of government witnesses was unduly restricted by the district court.

■■■ A trial court has considerable discretion in limiting the scope and extent of cross-examination in a criminal trial, so long as the defendant's sixth amendment

right of confrontation is not impinged. *United States v. Bright,* 630 F.2d 804, 817 (5th Cir. 1980); *United States v. Ramirez,* 622 F.2d 898, 899 (5th Cir. 1980). The exposure of possible motivations for false testimony is a fundamental element of cross-examination as protected and guaranteed by the confrontation clause. *United States v. Mayer,* 556 F.2d 245, 248 (5th Cir. 1977). Thus, cross-examination into any motivation or incentive a witness may have for falsifying his testimony *must* be permitted. *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974); *Cloud v. Thomas,* 627 F.2d 742, 744 (5th Cir. 1980). Such cross-examination should be given the largest possible scope, particularly with regard to the testimony of accomplices or others with substantial reason to cooperate with the government. *United States v. Mayer, supra,* 556 F.2d at 248–249; *United States v. Onori,* 535 F.2d 938, 945 (5th Cir. 1976). As this court noted in *Onori* :

> The Sixth Amendment confrontation clause guarantees to a criminal defendant the right to cross-examine a witness against him . . . . [This right] is so important that the defendant is allowed to "search" for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists.

*United States v. Onori, supra,* 535 F.2d at 945.

 In sum, defense counsel should be permitted to elicit on cross-examination those facts from which the jurors, as the sole triers of fact and credibility, might draw appropriate inferences relating to the reliability and truthfulness of the witnesses. *Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. at 1111.

We do not necessarily hold that the trial court erred in this regard. We merely emphasize for the purposes of remand that a witness's motivation for testifying, as well as any potential incentives for falsification, are always relevant lines of inquiry.

*Conclusion*

For the reasons delineated above, the convictions of Christopher Hall are reversed, and the case is remanded to the district court for a new trial.

REVERSED and REMANDED.

### APPENDIX
*Defense Counsel's Opening Argument*
. . . .

But, nevertheless, even with that background, and regardless of what their motivations were for coming in and cooperating with the Government, if they had cooperated with the Government, and if Chris Hall were, in fact, distributing, selling narcotics as the testimony supposedly is going to show you, what Mr. McSherry tells you, and if they are cooperating, and obviously they would be able to go in and make what the evidence will show are controlled by it [i. e., stenographic error for controlled buys]; by control, that means that they are under the control of the DEA Agent. That is, that they are able to go in, they search them before they go in, they send them in, they know that they have no narcotics on them when they go in, they buy narcotics and they come out, these are controlled sales. They can even wire them for sound so that you can hear everything that is being said, and then you take this substance that is alleged to be narcotics, you analyze it, if it is, then the charges are brought.

I don't know what evidence the Government is going to have in this case, but I have heard Mr. McSherry say nothing, nothing in his opening statement about any type of sale like that. Although he mentioned the DEA Agent who will testify, I predict that they have no control sales, and I predict to you that they will have no narcotics which they can introduce into evidence notwithstanding the fact because they say they are calling the chemist. The chemist is, of course, the man that analyzes the product, to determine whether or not it is Cocaine. If they have it, of course, they can make their case. And they are calling their chemist, presumably for that purpose.

But, I suggest to you that the facts will show that there were no control sales, because they couldn't make a control sale because Mr. Chris Hall was not distributing and selling narcotics as the Government has claimed. And, therefore, their case will rest entirely upon the uncorroborated word of persons that have made deals with the Government that have high motivations for fabricating to protect themselves and their loved ones.

And we suggest, that at the conclusion of the trial you will find not only from the evidence, and from your own common sense that this type of uncorroborated evidence is not worthy

of belief, to convict a person of a serious crime that Mr. Hall is charged for, but you will also find that His Honor will instruct you that that is the law that such testimony should be reviewed by you with great suspicion unless and until it is corroborated.

. . . .

*Defense Counsel's Closing Argument*

. . . .

Now, Mr. McSherry was just a little bit defensive I suggest, As Shakespeare would say, "I think he doth protest too much." He has spent half of his case here protesting about things that he didn't prove. He called a chemist, I mean, if it were not such a serious matter, it would be humorous to have this chemist up here talking about the L-isomer, or the D-isomer.

The Judge didn't instruct you anything about isomers, there is nothing in the indictment about isomers, unless if any of you are chemists, you probably don't understand isomers. I certainly don't understand isomers, but they got a chemist who never in his professional life had ever come into a Courtroom and testified as an expert when he didn't have the Cocaine there to examine it. Never. Why? Because they don't have any Cocaine. Well, that's another problem Mr. McSherry has, but he had an answer to that problem too.

I'll call Agent and testify, a very impressive man, he had been with DEA over ten years and he is going to testify how they make their cases, the different types of cases that they have.

You probably wondered, like I did, what does that have to do with what is going on here. Maybe it is a nice instructive course, and maybe he can teach that at the Academy in the Justice Department, but what does it have to do with this case here? Nothing. Nothing.

What they are doing is excusing what they know to be a weak case, and it is a weak case because they have nothing to corroborate the testimony of their witnesses. Nothing. And, as I told you in the opening remarks, this just isn't a theory of mine. Hey, "you can't believe these people. I think you know that." I think you know that in your own minds that people that are dealing in these type of things, and have gotten caught and are looking for ways out, they are looking to protect certain ones, they have got girlfriends, boyfriends, sources, whatever, and they are swaying and jiving and they are doing just about everything they can. These are very unreliable people, to say the least.

The Agent told you of a number of ways that they had of verifying these cases. And you know them. None of it was done. Why didn't they make a controlled buy? I think Mr. McSherry was trying to say, "Well, gee, one person was arrested, so therefore they couldn't make a controlled buy." Debbie was arrested. What does that have to do with why they couldn't make a controlled buy? He said, "If you believe what was being said to you by Mr. Beck, he said Chris was calling me up, trying to get paid his money." "And I am the one that told him that Debbie had been arrested." Well, fine, then he is discussing money, good. All right, you are the DEA agent, what do you do with these phone calls? About recording them. Don't talk about a secret, even a Court ordered wire tap, they could get that to tap his line if they wanted, but putting aside from that, one person to a phone conversation can record his own conversation. Certainly, DEA has the equipment, fine. You record that conversation, you get Chris Hall talking about drugs. Simple enough thing to do, isn't it?

None of that was done. What about the controlled buy? Or have someone go buy from him?

I mean, after all, if Jack Beck is going to cooperate with him, he has promised to, and Debbie is going to cooperate, and she has promised to, and everybody is cooperating, why did they tell him that there is an arrest, if that is, in fact, what happened? Why don't you go in and make this controlled buy?

They didn't do it. Well, if not that, what about something else? Let's see if we can get some other type of corroborative evidence. After all, he is supposed to be a big dealer.

Do they know where he lives? Sure, we have got his address. What do you do then? Get a search warrant, right? Where is the search warrant? You believe these people, you sure got probable cause to get a search warrant to go search his house. What are you going to find in this house? Supposedly all of this narcotics he is supposedly to have had. Nobody gets a search warrant.

No corroboration. At the very least, he is supposed to have had a scale in there, remember? He said we measured it out. Measured it out with what? What is the scale? Where is the Cocaine? Where is it, be it an L-isomer, or a D-isomer, where is it? They don't have it. They don't have anything. They have no corroboration.

They have got three people that have made deals for themselves.

. . . .

*The Cross-Examination of Debbie Ryan*

. . . .

Q Were you arrested for the charge against you?

A Yes, sir, I was.

Q Where were you arrested?

A I was arrested at Jack's apartment.

Q And were these people whose names you've given that you sold to were those—

A They were also arrested, yes.

Q Those were the ones charged with you?

A Yes, sir, right.

Q And were there any Federal Agents involved in the undercover work?

A Well, that's how I got arrested, there was a—

MR. McSHERRY: Your Honor, I am going to object. I don't see the relevancy, where or

not there were any Federal Agents involved in Miss Ryan's arrest. How does that pertain to this case?

THE COURT: What was the exact question.

MR. MURRAY: Were there any Federal Agents involved in the undercover work leading up to her arrest?

MR. McSHERRY: I don't see the relevancy; if we could approach the Bench, maybe Mr. Murray can clear that up a little.

THE COURT: All right.

(The following proceedings were held at the Bench, outside the hearing of the Jury:)

MR. McSHERRY: I don't understand the relevancy of the fact that any undercover agents were involved with her arrest. What does that have to do with it? I think he could ask her, he can't even—basically, he can go into her arrest, but what purpose does it—

THE COURT: What are you trying to find out?

MR. MURRAY: I am trying to find out the circumstances regarding her arrest, your Honor, that's all I want to do.

THE COURT: How does that relate to the issues in this case, not her case?

MR. MURRAY: I don't know until I get the answer, Judge.

THE COURT: Are you fishing?

MR. MURRAY: Judge, I will say for this record, and I know I am being picked up, and, of course, I am fishing. I am given a Jencks statement that says absolutely nothing. I am coming in here expecting that this witness is going to hurt me not one iota.

I am not concerned about her at all, that she gets on the stand, that she comes up with a number of things, so I am doing the only thing that I can do. I am getting up, and I am floundering, and I am trying my best to find something—

THE COURT: I don't think you are floundering.

MR. MURRAY: Well, I think I am, Judge, but—

THE COURT: It is basic to any question the lawyer asks in any trial, including this one. I ask you what is the relevancy, and you can't tell me.

MR. MURRAY: Judge, I can tell you. She made a plea-bargain agreement relative to her arrest. She said that she only had two sources to whom she was selling. The whole theme of our defense, Judge, is we maintain that there are people in this—

THE COURT: I am still waiting for the relevancy issue.

MR. MURRAY: Judge, I am trying to tell you.

We maintain that there are people in this thing that she is trying to protect. That they are all trying to protect. I am trying to find out who they are. I am trying to find out who was there, what the arrest was made, who was involved. That's all I am trying to do.

THE COURT: Go ahead.

MR. McSHERRY: But the fact that he asked her whether or not Federal Agents were involved—

THE COURT: I don't think that it is relevant.

MR. McSHERRY: I will tell you why he is asking it, because he wants to come back and argue to the Jury that no Federal Agents were involved in this case. And that is completely irrelevant, and I will bet you a dime to a donut that that is exactly what—

MR. MURRAY: Well, I will certainly argue that, Judge.

MR. McSHERRY: See, because it is not relevant, why should he be allowed to go in and show that in another case that Federal Agents were used, and why weren't they used in this case? It has no relevancy at all. They are talking about another case, another arrest. It has no—and not only does it not have no probative value, but he is going to attempt to use it to sustain an argument that he is going to make.

MR. MURRAY: That's true, Judge.

THE COURT: It is true.

MR. McSHERRY: And that's why he is not fishing, he said he's fishing.

THE COURT: I am going to let him ask the question. Go ahead, let's get going.

(At this point, proceedings held at the Bench were terminated.)

MR. MURRAY:

Q These sales that you were arrested for, were they made to undercover agents?

A Yes, basically they were made to Michael David, and the other man was in the room.

Q And Michael David brought him in and introduced him?

A No, he didn't introduce him, he was already there when I walked in the house. Looking like a friend.