IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

NO. 91-5799

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HENRY S. FULLER and
ROBERT DUANE FOSTER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas

_____

(October 6, 1992)

Before JONES and WIENER, Circuit Judges, and LITTLE, District Judge.[1]

LITTLE, District Judge:

Henry Silas Fuller and Robert Dwayne Foster were convicted of conspiracy to launder money. Fuller was also convicted of attempting to launder money. In their appeal, Foster and Fuller assert that the evidence, some of which was wrongfully admitted, was insufficient to support guilty verdicts. The appellants also suggest reversible error in the district court's submission of an instruction on deliberate ignorance. Finally, appellants contest the district court's determination of the sum subject to the

_____

[1] District Judge of the Western District of Louisiana, sitting by designation.

offence.  This error resulted in an enhanced sentence.  Finding no merit in any argument raised by either appellant, we affirm.

According to the indictment, Fuller and Foster allegedly conspired to launder money in violation of 18 U.S.C. § 371 and § 1956(a)(B).  Fuller was also charged with violating 18 U.S.C. § 1956(a)(3)(B), attempting to launder money represented by a law enforcement agent to be the proceeds of drug trafficking.  Taken in a light most favorable to the verdict, the following are the facts of the case.

Fuller, a domiciliary of Austin, Texas and generally a realtor of some ten years experience, met a bar owner in Del Rio, Texas in the spring of 1989.  Fuller asked bar owner Jose Martiarena if he knew of anyone with a strong desire to launder money.  Martiarena introduced Fuller to a government informant, Mike Nicholas.  Nicholas in turn introduced Fuller to government agent Alfonso Martinez.  On 16 May 1989 Martinez met with Fuller, Nicholas and David Ruiz, also a government agent.  Martinez was seeking assistance from Fuller in getting cash in and out of a banking system in such a way that the cash would be sanitized, i.e., any illegal taint would be removed and currency reporting forms would not have to be completed.  The meeting in May was conducted in a hotel room in San Antonio, Texas and was memorialized through video tape.  Fuller bemoaned the fact that a Brazilian based land sale for $25,000,000 had been upended when the government of Brazil appropriated his land for agrarian distribution.  Fuller was in need of legitimate funds, as much as $100,000, to finance the cost

of a legal attack on the Brazilian uncompensated confiscation. In anticipation of the receipt of $25,000,000, Fuller had gained knowledge in the art of moving money from place to place in order to lessen the impact of taxation. Fuller assumed some expertise in money management and secrecy by boasting of friendship with a group that had control over 23 banks. His knowledge would justify a 20% fee. Certainly the banks could assist Martinez, through Fuller, in hiding or cleansing money. Another currency cleansing creation of Fuller's involved a loan to Hemisphere Insurance Company, a Bahamian based insurance company. Hemisphere was in need of cash to fund the acquisition of another insurance company. Fuller could provide Martinez's dollars to Hemisphere in exchange for Hemisphere debentures. The transaction would be secured by a mortgage on Texas property owned by Hemisphere. As a quid pro quo for the loan, the insurance company, for a fee, would also assist in setting up a corporation offshore into which funds would be deposited and from which funds could be withdrawn without U. S. Government regulation. Fuller had the perfect cover. He would describe the funds to be camouflaged by the insurance company as part of his legally obtained funds from the Brazilian land transaction. In fact, he had a photocopy of a check to his order for the equivalent of $25,000,000, and that would be an impressive prop. Subsequent to the meeting, Fuller, through Foster, sent Martinez, through Nicholas, documents that could be used to effectuate the mortgage proposal.

On 21 June 1989, Martinez and Nicholas met in a San Antonio

3

hotel with Fuller and Foster.  This conclave was also the subject of a video and audio recordation.  Foster described himself to agent Martinez as a well-drilling fund raiser and real estate broker.  Foster sent Martinez financial statements on three related insurance companies, Hemisphere, Benefax and Bowman.  Foster was acquainted with the management of these companies and with offshore corporations and banking operations.  At this time the loan to Hemisphere Insurance Company or Benefax was discussed, as well as the creation of a Martinez controlled Bermuda based bank account into which and from which Martinez could direct funds.  Foster and Fuller both confirmed a fee arrangement ranging from a flat 20% to a declining sliding scale depending upon the volume of funds handled by Foster and Fuller.  For example, the commission would drop to 12 1/2% on funds administered in the amount of $1,000,000 or more per month.  Foster and Fuller were specifically advised that the funds were acquired by illegal activities.  Therefore, loss of the funds by Foster-Fuller would place Martinez in a hot spot.  Martinez could not go to court because he would be unable to disclose the source of his funds.

After the meeting of 21 June 1989, Martinez communicated by telephone with Fuller.  The next communication between Fuller and Martinez occurred on 1 May 1990, when Fuller, in response to a message from Martinez, called Martinez.  Over the next sixty days, there were four telephone calls between the two.  The third face to face meeting between Martinez and Fuller took place on 28 June 1990, again at the Embassy Suites Hotel in San Antonio, Texas.  The

4

third person at that meeting was an undercover San Antonio policeman. Foster, according to Fuller, was working offshore and could not attend the meeting. The laundering scheme was reviewed. Martinez gave $97,500 cash to Fuller. Fuller would carry the money to Foster. The funds would be deposited in a Hemisphere Insurance Company account in Bermuda. The corporation would then transfer the funds to a corporate account to be controlled by Martinez. Hemisphere would issue its debenture and Foster and Fuller would received a commission. Fuller prepared an accounting statement showing the costs, including fees, to which the $97,500 payment was exposed. Martinez's participation was evidenced by his cash delivery of $97,500 and his message to Fuller that he would get possession of the debentures on Sunday. After Fuller accepted the money and immediately prior to his intended departure, he was arrested. Among his possessions was a passport with markings evidencing recent and frequent trips to Brazil. Martinez knew that Fuller needed as much as $100,000 to finance his lawsuit in Brazil. Martinez said his clients were Colombians, but the money itself had no "white dust" on it.

Fuller testified that he knew the money was drug driven but that he intended to steal the money from Martinez. Fuller needed money to fund his Brazilian lawsuit and to get even with drug traffickers who had enticed his son down the dark side of the path. Fuller also testified that he told Foster that the Martinez money had come from South America. Foster testified that he was unaware that the Martinez funds were anything other than legally obtained.

SUFFICIENCY OF THE EVIDENCE

We review the evidence, and all reasonable inferences to be drawn therefrom, supporting a conviction in the light most favorable to the verdict. United States v. Tripplett, 922 F.2d 1174, 1177 (5th Cir. 1991), cert. denied, 111 S.Ct. 2245 (1991). We ask whether a rational jury could have found each defendant guilty beyond a reasonable doubt. Every reasonable theory of innocence need not be excluded. All credibility choices are decided in favor of the government. United States v. Montemayor, 703 F.2d 109, 115 (5th Cir. 1983), cert. denied, 464 U.S. 822 (1983); United States v. Green, 964 F.2d 365 (5th Cir. 1992); United States v. Breque, 964 F.2d 381 (5th Cir.), reh'q denied en banc, 1992 U.S. App. LEXIS 18664 (5th Cir. 1992).

## I.  FULLER'S CONVICTION

Fuller calls into question the sufficiency of evidence to convict him on the attempt to conduct a transaction proscribed by 18 U.S.C. § 1956(a)(3)(B). This statute criminalizes the laundering of funds received from an unlawful activity. It is well settled that mere preparation alone will not suffice to support conviction for conducting a financial transaction affecting interstate commerce. There must be a substantial step taken toward the commission of a crime. Fuller accepted drug money from an undercover agent and moved to depart from the hotel room. Fuller claims that these acts, acceptance of funds and an attempt to exit the building, do not amount to an attempt to conduct a financial transaction.

6

In order to convict under 18 U.S.C. § 1956, the government must prove beyond a reasonable doubt that the defendant involved himself in a financial transaction with property represented by the undercover agent to be the product of a specified unlawful activity. A specified unlawful activity, according to the statute, includes "dealing in narcotic or other dangerous drugs" punishable by imprisonment for not more than one year. 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). The government must also prove beyond a reasonable doubt that the defendant knew the illicit source of the funds and that the laundering was done with the intent to conceal or disguise the nature, location, source, ownership or control of the property. 18 U.S.C. § 1956(a)(3)(B). This circuit has adopted a two-step test for proof of attempt:

> We have stated a two-step test for finding criminal attempt. "To be guilty of an attempt, the defendant (1) must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempted," and (2) "must have engaged with conduct which constitutes a substantial step towards commission of the crime." United States v. Briscoe, 742 F.2d 842, 846 (5th Cir. 1984)(citations omitted). In order to establish a violation of 18 U.S.C. § 1956, the government must prove that the defendant (1) knowingly conducted a financial transaction ("financial transaction" in this context means "the movement of funds by wire or other means . . . which in any way or degree affects interstate or foreign commerce.") 18 U.S.C. § 1956(c)(4) (2) which involved the proceeds of unlawful activity and (3) with the intent to promote or further that unlawful activity.

United States v. Salazar, 958 F.2d 1285, (5th Cir. 1992).

Fuller does not dispute that he knew the source of the funds and that he intended to conceal or disguise the source of the funds. What Fuller does dispute is the sufficiency of the evidence

7

that equates his actions with "conducts" or "transaction" as those terms are defined in 18 U.S.C. § 1956(a)(3)(B). Fuller also disputes that the evidence is sufficient to link him with a financial transaction. The statute defines, but not in exclusive terms, the words "conducts," "transaction," and "financial transaction" as follows:

> (2) the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;
>
> (3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;
>
> (4) the term "financial transaction" means a transaction involving the movement of funds by wire or other means or involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, or a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

18 U.S.C. § 1956(c)(2)(3)(4).

Fuller would like the law to measure only his receipt of funds and his walk to the hotel door. Nothing in the statute requires such a restrictive reading. Fuller's entire relationship with the undercover agents must be, and was, the subject of jury evaluation. At three lengthy meetings, held over a fourteen month period, Fuller described in great detail methods that he could administer to cleanse the drug funds so that deposit and withdrawal reporting requirements could be avoided. Not only did Fuller suggest the

8

methods of law avoidance, but also he initiated steps towards perfection of plans to accomplish the illegal purpose. Fuller talked with insurance company executives, obtained financial data on accomplices to the scheme of laundering, and sent this material to the undercover agent. He prepared a detailed financial statement showing the source and application of funds when received from the undercover agent. He travelled widely in Texas in pursuance of factual data to support the benefits to be received by the undercover agent from the Fuller-created laundering schemes.

What did Fuller need to launder the money? He needed a solid plan, one that oozed with commercial merit, he needed the money, and he needed to transmit the money to the entity to perform the laundering function. What did Fuller do to accomplish the feat? He prepared a plan, he refined it after communicating with an intended recipient of the money, he demonstrated the commercial reasonableness of the plan to the undercover agent, he received the money, and was on his way to deliver the money to the sanitizing agent in a foreign situs when he was arrested. If he had made delivery of the money the crime would have been perfected.

Fuller cites U. S. v. Ramirez, 954 F.2d 1035 (5th Cir.), cert. denied, 112 S.Ct. 3010 (1992), as this circuit's rule that mere possession of money does not support "the inference that the defendant transferred, delivered, moved or otherwise disposed of the money as required by the statute." Id. at 1040. In Ramirez, this court overturned a conviction of money laundering when drug money was found in a house belonging to a co-conspirator. The

9

government had failed to show that the co-conspirator was involved in any way in a financial transaction with the money. The Ramirez holding is inapposite to this case. Fuller developed a procedure to launder funds derived from illegal sources. There is no constructive possession of money here. Fuller arranged a plan to circumvent currency reporting requirements and accepted cash to complete the plan. He was not an innocent dupe as was a co-conspirator in the Ramirez case. The evidence is overwhelming. A jury could easily conclude that Fuller was the mastermind of an intricate international plot concocted by him to conceal the source of large sums of drug money. Only Fuller's testimony supports his theory that he intended to fleece Martinez out of his money. The jury's determination will not be disturbed.

## II. FOSTER'S CONVICTION

Foster regards the indictment and evidence as insufficient to support his conviction for conspiracy to launder funds represented to be the proceeds of an unlawful activity. The indictment, according to Foster, is deficient in that there is no assertion by the Government that its agent warranted to Foster that the money for laundering came from an unlawful activity. The indictment charged that Fuller and Foster "willfully, knowingly and unlawfully conspired, combined, confederated and agreed together, and with each other, to commit an offense against the United States in violation of Title 18, United States Code, Section 371, that is to say, they conspired to launder money, in violation of Title 18, United States Code, Section 1956(a)(3)(B)." The indictment

10

described each of the specific elements of the offense, including the requirement that the Government agent certify the illegal source of the funds that are the subject of the laundering scheme.

The indictment is not invalid. A challenge similar to that raised by Foster was brought forth in United States v. Graves, 669 F.2d 964 (5th Cir. 1982). Graves claimed that an indictment for conspiracy to violate the Dyer Act was insufficient in that the indictment neglected to mention that Graves knew that the trucks were stolen and were valued at more than $5,000. In ruling on Graves' meritless argument, the court noted, as we do, that the defendant was charged with conspiracy to violate the law, not with a substantive violation of the law itself. In such a case, "the sufficiency of the indictment must be measured with regard to a conspiracy to violate a federal law rather than with regard for the substantive violations Graves conspired to commit." Id. at 968. The court in Graves went on to describe a sufficient indictment for conspiracy:

> An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

Id. at 968 (quoting with approval United States v. Bailey, 444 U.S. 394, 414 (1980)). The indictment of Foster clearly contains all of the elements of the statute and directly notifies him of the charges he is called upon to defend. We reject the argument that the indictment is defective.

Foster also argues that the evidence is insufficient to

11

support his conviction. Foster, having attended only one of the three meetings between Fuller and Martinez claims that he was never informed by Martinez that the Martinez funds were from the illegal sale of drugs. Supported by citations previously reported, we ask whether a rational jury could have found beyond a reasonable doubt that Foster was aware of the source of the Martinez funds. Or, as we stated in U.S. v. Arditti, 955 F.2d 331, 339 (5th Cir.), reh'g denied, 1992 U.S. App. LEXIS 13930 and 1992 U.S. App. LEXIS 13931 (5th Cir. 1992):

> In this case, it is enough that sufficient evidence was presented that the jury could have found beyond a reasonable doubt that (the Government agent) represented, and (the defendant) understood, that the funds they were laundering were the proceeds of the specified illegal activities.

Viewing the evidence in a light favorable to the verdict, we find sufficient evidence to support the conclusion that Foster knew the funds came from an illegal source. At the meeting of 21 June 1989, agent Martinez rejected the Foster researched transaction of a Texas land purchase, the land having been encumbered with a lease of questionable value. But agent Martinez expressed interest in offshore banking. Foster and Fuller explained the creation of an offshore account into which the Martinez money would be deposited. Even though the offshore corporation would use a wholly owned subsidiary as the account owner, only Martinez, or his designee, would have authority to make deposits and withdrawals. As Foster described the transaction, the account would look like a Hemisphere Insurance Company account, but the sole control over the account would vest in Martinez. All that would be required for the Bermuda

12

based account would be a minimum balance. Even large deposits and withdrawals would not attract attention. The money would be paid to Foster and Fuller, the commission extracted, and the net proceeds delivered to the insurance company. Foster recognized the risk of the transaction when he said, in discussing commissions:

> The terms are the same whether it's a hundred thousand or a hundred million, you're in trouble. It's what you did, not how much you did.

But Martinez wasn't as concerned about the commission and the danger of being detected as he was about the security of his client's money.

> Martinez: You feel, you may feel that I, am not going as fast as you want me to go, but I have to make sure that the money is secure. Yeah, the people down south, they don't want any excuses. . . . Okay, let me, let me just make sure you guys understand something, where I'm coming from. In these situations that I'm dealing with, some of these Colombians that I have to get the money to, sometimes deal with other people. They're gonna deal with the person that gives them the best deal. So if I want to get their money to run it through the system that we talked about right here, I've got to have, I've got to have a reasonable way to, a price for them. If not, they'll just go to somebody else and there's a lot of people out there that already helping them, and I have to compete with them and, and sometimes it's a little hard. But they also, you know, your also talking about large amounts of money in hard cash. Twelve percent sounds within reason, and it all depends what, how much the Colombian is going to give me that particular time . . . but you got to remember you know, the funds, you know, it's, if they leak out, the illegal, the illegality of the funds, the funds are illegal if they get lost, my recourse is very limited, you know that legally.

> Foster: I'll ride shotgun. How's that, I'll ride shotgun.

Martinez: Those are the sources of the funds, you know. . . . And I don't need any Colombians on my ass.

Fuller: Well, I don't think there's anyone involved now that doesn't understand what's, you know, what we're doing, I mean it's just totally, what we're doing is not legal and the main thing is, is to watch everyone's backs. And if one person gets caught well, he keeps his mouth shut and that's it and the best way for him not to know is not to ever meet anybody.

Martinez: Do we deliver it (the money) to you?

Fuller: Yeah, but you'll have a debenture.

Martinez: I'll tell you what, you know, I'll tell you guys an honest story. This happened to me, dealing with those Colombians, you know, this is common, you know, dealing with these Colombians, you know, this is common you know, dealing with Colombians, this happened to me. I went to, I called, they called me from down south and said, he says, Al, this is, you know, we got, we got some for you to pick up, I said, well, how much do you have? And he says 127. So I figured 127,000, and, and I misread them. So I have a small car and I, and, the Colombians I go pick them up and I pick up in the parking lots because I get there and I pick it up quick and disappear and I have my partners with me. So I say, so, so I get there and, God damn Colombian comes out, he says, I says, he says, well, here, you got it? And I say, I got the packages, he says, okay, I say, well let's transfer it to my car, he says quick. So he starts bring out the suitcases, and I have a little car, before I know it I've got suitcases tied all over the damn car and got some in the back, and I got 1.5 million bucks. I says, oh, it took me two weeks to get rid of that stuff. They followed me day in and day out. . . . I finally had, you know, it took me two weeks to get it back to them on this one, I said, hey, you know I can't move it that fast. . . .

Foster: God dang. . . .

Martinez: These Colombians that I deal with, they developed a trust in me enough that they'll

14

> release 1.5 million bucks to me. And of
> course they know quite a bit about me too, you
> know, but you know, by the same token, knock
> on wood, I've been fortunate and never lost
> any of their money, and I don't plan to, if I
> do, I'm going to have to make good or I'm
> going to have a very good explanation why some
> money gets lost.

Foster:    Well, you know, the front has got to look
           right too. It's just like, I saw on the news
           the other day that, that big bust with 80
           million worth of cocaine and the "carrier" has
           got a California driver's license, he rents a
           truck in Florida and he's speeding heading to
           California. Now that, I mean,

Martinez: He's looking for it.

Foster:    There's something wrong, there's something
           wrong here.

Rarely does a jury have the opportunity to see and hear the event at issue. Usually, the testimony of a witness to an event imparts that witnesses' personality in the reproduction. But in this case, the video tape recorded the entire event and made each juror an armchair witness, not hobbled by another's recollection. The jury could reasonably conclude that Martinez led Foster to believe that the funds to be laundered were the product of an illicit activity.

### DELIBERATE IGNORANCE INSTRUCTION

Foster and Fuller each object to the deliberate ignorance instruction related to the charge of conspiracy to launder money. The court instructed the jury that:

> You may find that a defendant had knowledge of a fact if
> you find that the defendant deliberately closed his eyes
> to what otherwise would have been obvious to him. While
> knowledge on the part of the defendant can not be
> established merely by demonstrating that the defendant
> was negligent, careless or foolish. Knowledge can be

15

inferred if the defendant deliberately blinded himself to the existence of a fact.

Foster and Fuller believe that the government agent is required by statute to represent to them that the money was the product of an illegal activity. Allegedly, the deliberate ignorance instruction compromises the statutory instruction. They also claim that the instruction is in error in a conspiracy case. Foster and Fuller assert that in a conspiracy case there must be evidence of a conscious agreement between the parties. The deliberate ignorance instruction, according to appellants, undercuts the heavy burden placed upon the government to prove a conspiracy.

In U. S. v. Daniel, 957 F.2d 162 (5th Cir. 1992), a defendant complained that the trial court should not have given an instruction on deliberate ignorance. The court first addressed the issue of standard of review:

> The standard of review of a claim that a jury instruction was inappropriate is "whether the courts charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to them." United States v. Lara-Velasquez, 919 F.2d 946, 950 (5th Cir. 1990) quoting from United States v. Stacey, 896 F.2d 75, 77 (5th Cir. 1990). This court has consistently upheld such an instruction as long as sufficient evidence supports its insertion into the charge.

Id. at 169. The giving of the deliberate ignorance instruction was not reversible error. Appellants insist that the instruction was wrongfully given because the jury could believe that the Government was only required to prove that the defendants should have known of the source of funds. We disagree. There is ample evidence that both defendants, in fact, knew that the source of the funds was

16

drug sales.  The instruction could not have misled the jury as to the proper standard.  The jury instruction that dealt specifically with 18 U.S.C. § 1956(a)(3)(B) made clear to the jury that the Government had to prove that the undercover agent made a representation.  Taken as a whole, the instructions were proper and there was no error in giving the deliberate ignorance instruction. See U.S. v. Breque, 964 F.2d 381 (5h Cir.), reh'g denied en banc, 1992 U.S. App. LEXIS 18664 (5th Cir. 1992) for an in depth analysis of the deliberate ignorance instruction in a case involving conspiracy and attempt to launder drug funds.

### AGENT'S EXPLANATION OF VIDEOTAPE RECORDINGS

The appellants complain that the videotapes of the three meetings with the undercover agent were improperly embellished when the agent was allowed to explain and interpret the argot or seemingly secret jargon of the alleged criminals.  For example, the undercover agent was permitted to advise the jury of the meaning and import of the witnesses' recorded words.  The undercover agent was allowed to explain the term "move around" money; to explain the prominence of the Bahamas in drug money laundering schemes; to explain the money owners' reason for avoiding the completion of currency declaration forms; to explain the meaning of money laundering; to explain currency transaction reporting requirements; to explain the significance of small bills in money laundering of proceeds from narcotic sales; to explain that Colombia is a country well known for its international drug trafficking.  All of the admissions were in the nature of self serving testimony from one

17

not qualified to give expert testimony, so say the appellants. The appellants cite this circuit's opinion in U. S. v. Hall, 653 F.2d 1002 (5th Cir. 1991) as authority for their demands that their convictions be reversed. On examination, Hall will not support the defendant's theory for reversal. We need but quote from the Hall decision to distinguish the testimony in that case from this.

> To bolster its case, the government called its final witness, DEA agent John Donald. Donald did not participate in the investigation leading to Hall's arrest and prosecution, and was in no way connected with the development of the case against Hall. The sole purpose of his testimony was to respond to defense counsel's suggestion that the government had been unable to obtain corroborating physical evidence against Hall because Hall was innocent of the offenses charged. Donald testified in general terms about the various procedures used by the DEA in its narcotics investigations. In sum, Donald described the various investigative techniques and testified that it is not always possible to conduct a "controlled buy" and seizure of narcotics during the course of an investigation, particularly where the conspiracy under investigation has already terminated by the time the investigation is commenced or the subject of the investigation is insulated in the higher echelons of the narcotics conspiracy.

> In essence, Donald testified as a kind of quasi-expert on DEA investigative procedures, and his testimony was limited to the general and quite hypothetical descriptions of accepted practice that are typical of the expert witness. He testified to no facts bearing on any manner on the prosecution of Christopher Hall or on the investigation leading to that prosecution. His testimony had no tendency whatsoever to make the existence of any fact of consequence to the government's case in chief either more or less probable than it would have been without his testimony.

Hall, 653 F.2d at 1005, 1006. The undercover agent in this case, Martinez, presented relevant evidence. He testified as to facts directly bearing on the investigation and ultimate arrest of both Foster and Fuller. He was professionally qualified to testify as

18

to the usual meanings, in the words of drug money laundering, of terms used by the parties to the conversations. The Martinez testimony was relevant and admissible. FED. R. EVID. 402.

THE SENTENCE

Appellants find fault with the district judge's assessment of the amount involved in the offense. The district judge concluded that $2,097,000 was the amount of money involved in the offense and this finding produced a six level upward adjustment to the base level offense. The district court applied a base offense level of twenty as required by U.S.S.G. § 2S1.1(a)(2), and a six level upward adjustment for the specific offense characteristic because the funds to be laundered under the scheme exceeded $2,000,000. U.S.S.G. § 2S1.1(b)(G). In making its determination of the amount involved, the trial court cited the negotiations of the 21 June 1989 meeting during which the defendants discussed the ease with which $1,000,000 a month could be laundered. The court also observed that placing the amount at $2,097,000 was conservative and modest. The actual sum could have been as high as $25,000,000. Our standard of review of factual findings upon which a sentence is based has been succinctly stated in a recent opinion:

> The district court's findings about the quantity of drugs on which a sentence should be based are factual findings which we review for clear error. United States v. Rivera, 898 F.2d 442, 445 (5th Cir. 1990). A finding will not satisfy this deferential standard "`when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948)); see also United

19

States v. Sanders, 942 F.2d 894, 897 (5th Cir. 1991) ("a factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole").  The district court is not limited to considering the amount of drugs seized or specified in the charging instrument. United States v. Sarasti, 869 F.2d 805, 806 (5th Cir. 1989), but may consider amounts that were part of a common plan or scheme to distribute.  United States v. Ponce, 917 F.2d 841, 844 (5th Cir. 1990) (per curiam), cert. denied, ____ U.S. ____, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991); United States v. Byrd, 898 F.2d 450, 452 (5th Cir. 1990).  The ultimate sentence will be upheld so long as it results from a correct application of the Guidelines to factual findings that are not clearly erroneous.  Rivera, 898 F.2d at 445; United States v. Buenrostro, 868 F.2d 135, 136-37 (5th Cir. 1989), cert. denied, 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990).

U.S. v. Mitchell, 964 F.2d 454 (5th Cir. 19 June 1992).  The district court was guided by United States v. Richardson, 925 F.2d 112, 116 (5th Cir. 1991), cert. denied, 111 S.Ct. 2686 (1991) when it made the factual determination as to the amount of money that the defendants were "reasonably capable" of laundering.  The analysis by the district judge was well within the bounds of reason.  Fuller had the perfect cover, the Brazil land sale for $25,000,000.  That sum would provide the shade of validity to launder the drug money from the clients of the government agent. We find no clear error in the analysis by the district court. There are no factual inaccuracies presented to question the court's logical conclusions.

All of the arguments of appellants have been reviewed and refuted.  We AFFIRM the convictions and sentences with respect to each defendant.

20