[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11896
_____

D.C. Docket No. 1:12-cv-00258-WSD

PURCHASING POWER, LLC,

Plaintiff - Appellant,

versus

BLUESTEM BRANDS, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 20, 2017)

Before WILSON and JILL PRYOR, Circuit Judges, and BUCKLEW,* District
Judge.

_____

* Honorable Susan C. Bucklew, United States District Judge for the Middle District of
Florida, sitting by designation.

WILSON, Circuit Judge:

This case demonstrates the difficulty of applying established diversity jurisdiction principles to 21st-century business organizations.  When determining citizenship of the parties for diversity jurisdiction purposes, a limited liability company (LLC) is a citizen of every state that any member is a citizen of.  And it is common for an LLC to be a member of another LLC.  Consequently, citizenship of LLCs often ends up looking like a factor tree that exponentially expands every time a member turns out to be another LLC, thereby restarting the process of identifying the members of that LLC.  The simplest misstep has the potential to derail years of litigation and result in a massive financial sanction, as happened here.  It is in everyone's best interest, both the litigants' and the courts', to verify that diversity jurisdiction exists before proceeding with the case.  Everyone involved in this case trusted that diversity jurisdiction existed, but no one verified it.  The law firms involved trusted their clients.  The clients trusted their lawyers. The law firms trusted each other, and the district court trusted them.  But there was no verification.

## I.    FACTS

This case began when Purchasing Power LLC (Purchasing Power), represented by the law firm Burr & Forman (B&F), sued Bluestem Brands Inc.

2

(Bluestem) in Georgia state court in December 2011.[1]  Bluestem, a citizen of Minnesota and Delaware, sought to remove the case to federal court based on diversity jurisdiction.  Counsel for Bluestem, Randall Kahnke, emailed counsel for Purchasing Power, Joe Letzer, to determine the citizenship of Purchasing Power for diversity purposes.

The citizenship of an LLC is the citizenship of each member.  Purchasing Power has one member—Purchasing Power Holdings LLC (Holdings).  Holdings' members were individual residents of Georgia and three LLCs—(1) Rockbridge Growth Equity LLC (Rockbridge), (2) Falcon Investment Advisors LLC (Falcon), (3) and Stephens-Purchasing Power LLC (Stephens).  To determine the citizenship of Purchasing Power, one would need to know the citizenship of the members of LLCs thrice removed (Purchasing Power → Holdings → Rockbridge/Falcon/Stephens).  Letzer and other B&F attorneys instructed the officers of Purchasing Power that they needed to know the residences of the LLC members[2] to respond to Kahnke's request.  Letzer was aware that Bluestem was a citizen of Minnesota and Delaware.  After receiving several guarantees from Richard Carrano—the CEO, President, and Corporate Secretary of Purchasing

---

[1] Purchasing Power and Bluestem compete in the business of "payroll deduction" sales, or the sale of goods to employees by allowing deductions from employees' pay.

[2] A quick note on terminology, as terminology is critically important to understanding this case.  "Holdings' members" refers to the members of Holdings (i.e., the nine individuals who were residents of Georgia and the three LLCs).  "LLCs" refers to the three LLCs that were members of Holdings (i.e., Rockbridge, Stephens, and Falcon).  "LLC members" refers to the members of those LLCs (i.e., the members of Rockbridge, Stephens, and Falcon).

Power—that none of the LLC members were from Minnesota or Delaware, Letzer responded to Kahnke in an email: "[W]e are informed by our client that none of the members of the LLC are resident citizens of either the states of Minnesota or Delaware. We trust this gives you the essential information you requested to assess removability on diversity grounds." Kahnke attached this email to Bluestem's removal petition filed on January 25, 2012, as the only evidence that complete diversity existed.

On August 3, 2012, Bluestem served written discovery requests on Purchasing Power, which included two requests for production of documents relating to the identity, residency, and citizenship of Holdings' members (Request 41) and of the LLC members (Request 42). B&F stated that it would comply with Request 41 but asked for a confidentiality agreement first. B&F objected to Request 42 because Purchasing Power did not have the requested information in its care, custody, or control; Purchasing Power either did not know who the LLC members were or could not compel the LLC members to turn over the information. Also, B&F did not believe the information was relevant because jurisdiction had already been established and would be supported by the documents in Request 41. On November 12, 2012, Bluestem's counsel sent a letter to B&F stating that Request 42 was relevant because it related to jurisdiction. On November 19, 2012, B&F responded that (1) it could not obtain some of the

information demanded in Request 42 (the identity of the LLC members) and (2) the information was irrelevant because Letzer's email was sufficient for "determining subject matter jurisdiction in this case."

Following the November 19 response, neither Bluestem, nor B&F, nor the district court took additional steps to verify that subject matter jurisdiction existed. On May 19, 2014, the district court granted summary judgment in favor of Bluestem on all claims. On appeal, we noted that the pleadings did not sufficiently allege Purchasing Power's citizenship. This started an inquiry, more than two years after removal, that led to the realization that there was no diversity jurisdiction.

What B&F failed to realize, and no one bothered to investigate, was that Falcon, one of the LLCs, did not own an interest in Holdings directly. Falcon's interest in Holdings was owned by a corporation that Falcon had set up for tax purposes. Hence, instead of the ownership flow chart being Falcon LLC → Holdings → Purchasing Power, it was Falcon LLC → Falcon Inc. → Holdings → Purchasing Power. The relevant party for Purchasing Power's diversity citizenship was Falcon Inc., the corporation that owned the interest in Holdings. Falcon Inc. was incorporated in Delaware, of which Bluestem was a citizen, and destroyed diversity jurisdiction.

5

After this realization, the district court sanctioned B&F under the court's inherent power and Rule 26(g)(3) of the Federal Rules of Civil Procedure.[3] The district court found that B&F misrepresented to either the court or Bluestem on five occasions that diversity of citizenship existed—(1) in Letzer's email, (2) in the Joint Preliminary Report and Discovery Plan, (3) in the Amended Complaint, and (4–5) in proposed amended complaints. The district court found that the B&F lawyers "failed completely to perform their professional duties to the Parties and the Court in this matter" and ordered B&F to pay Bluestem $582,385 in fees and costs.

B&F appeals the sanctions order. We reverse the district court's sanction.

## II.    STANDARD OF REVIEW

We review sanctions orders for an abuse of discretion. *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1237 (11th Cir. 2007). "An abuse

---

[3] The district court imposed the monetary sanction under its inherent power. The rest of this opinion will discuss the district court's application of its inherent power. The Rule 26 sanctions are overturned. Rule 26(g) applies to "disclosure[s] under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection." Fed. R. Civ. P. 26(g)(1). Although the district court does not clearly demarcate what conduct it sanctioned under its inherent power or under Rule 26(g), the only conduct that could be properly sanctioned under Rule 26(g) was B&F's objection to Request 42. But even that conduct cannot be sanctioned under Rule 26(g).

The district court found fault with B&F's objection because the purpose of the objection was "to avoid discovery of information [Purchasing Power] told [B&F] it did not want disclosed." This statement is a proper purpose of an objection and does not justify imposing Rule 26 sanctions in this instance. Further, the district court implied that B&F objected to the request despite knowing the "critical bearing" this information had on diversity jurisdiction. However, its objection was that Bluestem already had the necessary jurisdiction information and anything more was not relevant or not in Purchasing Power's control. Bluestem's silent response to B&F's objection signaled its agreement with that view.

of discretion occurs when the district court applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner . . . or ignores or misunderstands the relevant evidence." *Sciarretta v. Lincoln Nat'l Life Ins.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (internal quotation marks omitted).

## III.    INHERENT POWER SANCTIONS

Courts have the inherent power to police those appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S. Ct. 2123, 2133 (1991).  A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43, 111 S. Ct. at 2132 (citing *Link v. Wabash R.R.*, 370 U.S. 626, 630–31, 82 S. Ct. 1386, 1389 (1962)).  This power "must be exercised with restraint and discretion" and used  "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45, 111 S. Ct. at 2132–33.  A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Revenue Corp.*, 568 U.S.___, ___, 133 S. Ct. 1166, 1175 (2013) (citing *Chambers*, 501 U.S. at 45–46, 111 S. Ct. at 2133–34).  The dual purpose of this power is to vindicate judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole. *See Chambers*, 501 U.S. at 46, 111 S. Ct. at 2133.  The

7

key to unlocking a court's inherent power is a finding of bad faith. *See Sciaretta*, 778 F.3d at 1212.

The district court found that B&F acted in bad faith when it failed to investigate adequately Purchasing Power's citizenship before it represented to Bluestem and the court that diversity jurisdiction existed. We hold that this was an abuse of discretion because the district court applied an incorrect standard for inherent power sanctions and ignored or misunderstood relevant evidence. While the specific reasons justifying reversal are examined below, the general reason we reach this conclusion is that B&F's conduct did not amount to conduct that "abuse[d] the judicial process." *See Chambers*, 501 U.S. at 45, 111 S. Ct. at 2133.

## A. Incorrect Standard

In laying out the standard for inherent power sanctions the district court stated that: "The issue here, thus, is whether [B&F's] specious inquiry into [Purchasing Power]'s jurisdiction and their jurisdictional misrepresentations were reckless." Also, the district court relied on cases discussing sanctions under 28 U.S.C. § 1927 and Rule 11 to state that inherent power sanctions are governed by an objective standard. That is an incorrect recitation of the standard for inherent power sanctions. The standard is a subjective standard with a narrow exception for conduct tantamount to bad faith. Furthermore, recklessness alone does not constitute conduct tantamount to bad faith.

8

As a starting point, the inherent-powers standard is a subjective bad-faith standard.[4] The Supreme Court recently summarized the scope of a court's inherent powers, stating: "[A] court has [the] inherent power to award attorney's fees to a party whose litigation efforts directly benefit others, to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx*, 568 U.S. at ___, 133 S. Ct. at 1175 (citing *Chambers*, 501 U.S. at 45–46, 111 S. Ct. at 2133–34). Our circuit has linked inherent power sanctions with subjective bad faith—"there is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm for their subjective bad faith." *In re Mroz*, 65 F.3d 1567, 1576 (11th Cir. 1995). And in *Barnes*, we stated that "[a] finding of bad faith is warranted where an attorney . . . argues a meritorious claim for the purpose of harassing an opponent." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th

---

[4] We are not saying that Rule 11 or § 1927 are governed by a subjective bad-faith standard. Rule 11 and § 1927 are governed by their own statutory scheme. The district court reached the conclusion that its inherent powers could rectify reckless conduct because the court blurred the lines between the inherent power standard and the standard used for Rule 11 and § 1927 sanctions. While these powers can be used to punish the same areas of conduct, they are not governed by the same standard. Neither Rule 11 nor § 1927 requires a finding of bad faith. *See Chambers*, 501 U.S. at 47, 111 S. Ct. at 2134 ("Rule 11, for example, imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith."); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 2465 (1980) (upholding a sanction under § 1927 and stating that "the trial court did not make a specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers"). In contrast, the key to unlocking the inherent powers is a finding of bad faith (which includes other descriptors from the Supreme Court—i.e., vexatiously, wantonly, and for oppressive reasons). *See Sciaretta*, 778 F.3d at 1212. District courts should hesitate when using Rule 11 or § 1927 cases to justify the use of their inherent powers.

9

Cir. 1998) (internal quotation marks omitted). If inherent-powers sanctions were governed by a purely objective standard, we would never sanction an attorney for a meritorious claim. A meritorious claim would always be objectively reasonable. We can only sanction attorneys for meritorious claims by discerning their subjective intent. More recently, the requirement for subjective bad faith was reinforced in *Sciaretta* when we quoted with approval the Second Circuit's statement that inherent powers sanctions require subjective bad faith. *See Sciarretta*, 778 F.3d at 1212 (citing *Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) ("[S]ua sponte sanctions . . . should issue only upon a finding of subjective bad faith.")).

The Supreme Court has confirmed by implication that a court's inherent power is governed by a subjective standard. Dissenting in *Chambers*—a case outlining a court's inherent power—Justice Kennedy raised the concern that the Court's holding would open the floodgates for more sanctions because of the lack of guidance on what constituted bad faith. *Chambers*, 501 U.S. at 68, 111 S. Ct at 2145 (Kennedy, J., dissenting) ("[T]he Court's bad-faith standard, at least without adequate definition, thwarts the first requirement of due process, namely, that all are entitled to be informed as to what the State commands or forbids." (internal quotation marks omitted)). The majority responded in footnote 11, stating that "Rule 11 was amended in 1983 precisely because the subjective bad-faith standard

10

was difficult to establish and courts were therefore reluctant to invoke it as a means of imposing sanctions." *Chambers*, 501 U.S. at 47 n.11, 111 S. Ct. at 2134 n.11. As such, "there is little risk that courts will invoke their inherent power to chill the advocacy of litigants attempting to vindicate all other important federal rights." *Id.* (internal quotation marks omitted). In other words, Justice Kennedy's fears were unfounded because the subjective nature of the inherent powers standard restricts a court's ability to impose sanctions.

However, in the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith. *See Roadway Exp.*, 447 U.S. at 767, 100 S. Ct. at 2465 (stating that inherent powers require a finding that "counsel's conduct . . . constituted or was **tantamount to bad faith**" (emphasis added)). This is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith. *See Barnes*, 158 F.3d at 1214 (holding that recklessness can constitute bad faith if the recklessness is "particularly egregious" or if a party raises an argument that is "reckless [and] frivolous"). The district court's standard required a showing of only recklessness and nothing more. That is the incorrect standard.

The idea of recklessness sufficing to unlock a court's inherent powers comes from *Barnes*, which stated, "[a] finding of bad faith is warranted where an attorney

11

knowingly or **recklessly** raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id.* (internal quotation marks omitted) (emphasis added). The key to understanding the *Barnes* quote is that it is not saying recklessness suffices; it is saying recklessness plus a frivolous argument suffice. That *Barnes* quote originates from a Ninth Circuit opinion, stating:

> For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass. Thus, while it is true that reckless filings may be sanctioned, and nonfrivolous filings may also be sanctioned, reckless nonfrivolous filings, without more, may not be sanctioned.

*In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996). Recklessness alone does not satisfy the inherent powers standard; there must be more.

If a district court is unsure whether to sanction a party under its inherent powers, it should look to the guidance of the Supreme Court in *Chambers*. The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole. *See Chambers*, 501 U.S. at 45–46, 111 S. Ct. at 2133. The inherent power must be exercised with restraint and discretion. This power is not a remedy for protracted litigation; it is for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial. *See id.* at 44, 111 S. Ct. at 2132. Courts considering whether to impose sanctions under their inherent power should look

for disobedience and be guided by the purpose of vindicating judicial authority. None of these concerns are present here.

## B. Consideration of Relevant Evidence

In assessing whether a party should be sanctioned, a court examines the wrongdoing in the context of the case, including the culpability of other parties. *See id.* at 50, 111 S. Ct. at 2136 (reviewing sanctions "in the circumstances of this case"). The district court failed to afford due consideration to evidence relevant to this inquiry, specifically: (1) Bluestem's removal burden, (2) Bluestem's submissions to the court, and (3) B&F's efforts to identify Purchasing Power's citizenship.

### 1. *Removal Burden*

"A party removing a case to federal court based on diversity of citizenship bears the burden of establishing the citizenship of the parties." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (per curiam); *see also Scimone v. Carnival Corp.*, 720 F.3d 876, 882 (11th Cir. 2013) ("[T]he burden of establishing removal jurisdiction rests with the defendant seeking removal."). Although Bluestem carried the burden of establishing diversity jurisdiction at all times, the district court excused Bluestem's failure because Purchasing Power objected during discovery to a request aimed at

13

establishing jurisdiction.[5]  An objection does not relieve Bluestem of its duty to

establish diversity jurisdiction.  Bluestem had a responsibility to raise the issue of

Purchasing Power's objection with the court.  Failure to bring the issue to the

district court was a failure of its duty as the removing party.  Purchasing Power's

actions do not excuse this failure.

## 2.  *Submissions to the Court*

The district court did not account for problematic submissions to the court

from Bluestem.  In the submissions, Bluestem represented that jurisdiction existed

and set forth questionable assertions.

Bluestem stated in its removal petition that "Purchasing Power, a Georgia

limited liability company, has no members that are citizens of either Minnesota or

Delaware.  (See Exhibit B)."  Exhibit B is the email from Letzer that stated, "[W]e

are informed by our client that none of the members of the LLC are resident

citizens of either the states of Minnesota or Delaware."  Bluestem stated as fact

what B&F relayed **only** as knowledge.  Although this misrepresentation might

initially seem trivial, it obscured what would have been a red flag.  To begin with,

Bluestem did not need to state in its removal petition the citizenship of Purchasing

[5] B&F's objection was that Bluestem already had the necessary jurisdictional information and anything more was not relevant or not in Purchasing Power's control.  The court stated that when "[the B&F attorney] offered this objection she knew full well that [Bluestem] was considering removal."  B&F objected to the request on September 4, 2012.  The case was removed on January 25, 2012.  Bluestem was not considering removal; it had already removed the case.

14

Power.  *See Corp. Mgmt. Advisors, Inc. v. Artjen Complexus, Inc.*, 561 F.3d 1294, 1297 (11th Cir. 2009) ("If a party fails to specifically allege citizenship in their notice of removal, the district court should allow that party to cure the omission, as authorized by § 1653."  (internal quotation marks omitted)).  If Bluestem had stated in its removal petition what knowledge it actually had—Purchasing Power **believes** none of its members are citizens of Minnesota or Delaware—instead of what it stated—Purchasing Power **has** no members that are citizens of Minnesota or Delaware—there is a greater chance that the district court would have been alerted to the fatal jurisdictional issue earlier.  Instead, by stating as fact what was only Purchasing Power's belief, Bluestem shielded a potential issue that would have thwarted its removal efforts.

Furthermore, the Joint Preliminary Report and Discovery Plan form asked if there were any issues with jurisdiction, and neither party raised concerns about subject matter jurisdiction.  Bluestem knew it was required to list all of the LLC members[6] and knew it had not done this.  Despite knowing these diversity jurisdiction deficiencies, Bluestem did not raise the issue when explicitly asked on the form.

---

[6] The district court imputed to B&F the knowledge of Eleventh Circuit citizenship requirements for LLCs.  *See Rolling Greens*, 374 F.3d at 1022 (11th Cir. 2004) ("To sufficiently allege the citizenships of these unincorporated business entities, a party must list the citizenships of all the members of the limited liability company.").  It is only fair to impute the same knowledge to Bluestem.

15

One of B&F's representations the district court took issue with was at the end of paragraph 3 of the amended complaint, which stated: "This Court has subject matter jurisdiction over the claims at issue in this action." This sentence was appended to a section that discussed personal jurisdiction. Bluestem replied in its answer that "Bluestem denies the allegations contained in paragraph 3 of the Amended Complaint." Paragraph 3 discussed both personal jurisdiction and subject matter jurisdiction. There are two possible ways to read Bluestem's denial of paragraph 3. One interpretation is that Bluestem thought that there was an issue with subject matter jurisdiction but conspicuously kept quiet to avoid destroying diversity, a sanctionable offense in its own right. But the more likely interpretation is that Bluestem was denying the allegations regarding personal jurisdiction and admitting that there was subject matter jurisdiction. Bluestem was either more culpable than or as culpable as B&F for creating the impression that subject matter jurisdiction existed.

### 3.  *B&F's Investigation*

The district court stated that "[t]here is no evidence that [B&F] investigated [Purchasing Power]'s citizenship." It is unclear whether the district court meant that B&F never investigated or did not investigate before Letzer's email to Kahnke. However, the district court's statement is incorrect even if we assume the

court was referring to B&F's actions before Letzer's email.  Here is the extent of

B&F's investigation prior to Letzer's email:

- On November 29, 2011, B&F attorneys met with Purchasing Power Officers—Richard Carrano, who is the CEO/President/Corporate Secretary, and Chadwick Delp, who is the CFO—who informed the attorneys that (1) Purchasing Power's sole member was Holdings; (2) Holdings' members included a number of individuals whom Carrano and Delp believed to be residents of Georgia and three LLCs—Rockbridge (an LLC of Michigan); Falcon (an LLC of Massachusetts); and Stephens (an LLC of Arkansas); and (3) the LLC members were individuals who resided in Michigan, Massachusetts, and Arkansas.  One of the officers, Delp, formerly worked at Stephens-Purchasing and was able to speak about the citizenship of the members with confidence.

- On January 6, 2012, B&F attorney Letzer emailed Carrano asking him for the citizenship information that Bluestem requested.

- Around January 6, 2012, Letzer called Carrano to discuss Bluestem's request for information about Purchasing Power's ownership.  Carrano reiterated the information from the November 29 meeting.  Letzer requested the residencies of all of the individual members and the members of the LLCs.  Carrano stated that he did not have most of that information.  He told Letzer that he would get back to Letzer.

- On January 19, 2012, Letzer emailed Carrano again, seeking the information.

- Around January 19, 2012, Letzer called Delp, who stated that Holdings' members included a number of individuals who resided in Georgia and three investment LLCs—Purchasing Power Investors LLC (with members residing in Michigan); FSP III Kendrick Purchasing Power Holdings LLC (with members residing in Massachusetts); and Stephens (with members residing in Arkansas).

- On January 20, 2012, Letzer received an email from Carrano containing a chart listing each member of Holdings and their states of residence.  Carrano created this chart from information he obtained by

17

reviewing the notice provisions in the Unit Purchase & Recapitalization Agreement (UPRA).[7]

- ▪ On January 20, 2012, Letzer emailed Bluestem's counsel to inform the counsel that, based on the representations of Purchasing Power, no member was a citizen of Delaware or Minnesota.

This investigation might be lacking, but an investigation nevertheless occurred.

## IV.    CONCLUSION

We reverse the district court's imposition of sanctions.  While the requirements of diversity jurisdiction in this scenario are complicated, they are the law.  No party in this case acted with bad intentions, but the result was a colossal waste of time and effort.  We trust that the damage done to the parties' credibility, finances, and time is enough of a sanction to curb their conduct and to serve as a warning to future diversity jurisdiction litigants.  In the end, when the parties do not do their part, the burden falls on the courts to make sure parties satisfy the requirements of diversity jurisdiction.  We must be vigilant in forcing parties to meet the unfortunate demands of diversity jurisdiction in the 21st century.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006) ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

---

[7] The UPRA is one of the documents involved in the transaction that created Purchasing Power's ownership structure.

18

**REVERSED.**