[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13608

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,
ex. rel. Lori L. Carver,

Plaintiff-Appellee,

LORI L. CARVER,

Interested Party-Appellant,

*versus*

PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:13-cv-00392-JB-N

_____

Before ROSENBAUM, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Lori Carver filed a *qui tam* action seeking recovery on behalf of the United States under the False Claims Act ("FCA"), *see* 31 U.S.C. § 3730, for fraudulent claims paid by government healthcare programs that were submitted by her former employers. The government initially declined to intervene in the case, leaving Carver in charge of prosecuting it. Several years later, though, the government changed its mind and moved to intervene for the purpose of exercising its right to unilaterally dismiss the FCA action under 31 U.S.C. § 3730(c)(2)(A). The government's motion explained in detail why it had come to believe that the burdens of continued litigation outweighed its benefits. The district court granted that motion, and Carver appeals. Because the government gave good grounds, amply supported by the record, for seeking dismissal of this action, the district court did not abuse its discretion by granting the government's motion. We affirm.

## I. The False Claims Act

The FCA imposes civil liability on any person who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the federal government, among other things. 31 U.S.C.

§ 3729(a).  The FCA is enforced through a public-private framework: the government may sue alleged violators on its own, *id.* § 3730(a); or a private person—called a "relator"—may sue "in the name of the [g]overnment," which is known as a *qui tam* action.  *Id.* § 3730(b)(1).  Either way, the injury asserted is "exclusively to the [g]overnment."  *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720, 1727 (2023).  Nevertheless, "[i]f the action leads to a recovery, the relator may receive up to 30% of the total."  *Id.* (citing 31 U.S.C. § 3730(d)(1)–(2)).

A relator is "no ordinary civil plaintiff" and is "subject to special restrictions."  *Id.* at 1727–28.  Among them, the relator must file the complaint under seal, and the government then has 60 days—which can be extended for "good cause"—to "intervene and proceed with the action."  31 U.S.C. § 3730(b)(2)–(3).  "If the [g]overnment, during that so-called seal period, elects to intervene, the relator loses control," and the government takes over.  *Polanksy*, 143 S. Ct. at 1727–28 (citing 31 U.S.C. § 3730(b)(4)(A), (c)(1)).  If that occurs, the government "may dismiss the action notwithstanding the objections" of the relator so long as the relator receives notice and an opportunity for a hearing.  31 U.S.C. § 3730(c)(2)(A).

But the relator "shall have the right to conduct the action" if the government opts not to intervene.  *Id.* § 3730(b)(4), (c)(3).  Even if the government declines to intervene during the seal period, though, "the relator is not home free."  *Polanksy*, 143 S. Ct. at 1728.

The court may "permit the [g]overnment to intervene at a later date upon a showing of good cause." 31 U.S.C. § 3730(c)(3).

## II.  Background

### A.  Carver files a qui tam case and the government declines to intervene.

From 2010 to 2013, Carver worked at Physician's Pain Specialists of Alabama, PC (the Clinic), a pain-management clinic in Mobile, Alabama.  Two medical doctors, John Patrick Couch and Xiulu Ruan, owned and operated the Clinic.  They also ran a pharmacy, C&R Pharmacy, LLC (the Pharmacy).  As part of their pain-management practice, Couch and Ruan conducted urine drug screening through an arrangement with Castle Medical, LLC (Castle).

Carver discovered that Couch and Ruan had submitted fraudulent claims for payment to federal healthcare programs.  She took this information to the U.S. Attorney's office, which encouraged her to bring a *qui tam* action.  *See United States v. Couch*, 906 F.3d 1223, 1226–27 (11th Cir. 2018) (summarizing this history).

Carver filed the suggested *qui tam* action in August 2013 and an amended pleading in August 2014.  The government repeatedly requested and received extensions of the seal period to decide whether to intervene in the case.  Finally, in October 2016, the government filed a notice declining to intervene.  Soon after, Carver filed her second amended complaint, after which the government again declined to intervene.  The district court unsealed the pleadings and some other filings and ordered the *qui tam* case to move forward.

B.  *The government prosecutes Couch and Ruan.*

Meanwhile, the government began investigating Couch and Ruan based in part on Carver's information.  *Couch*, 906 F.3d at 1226.  In April 2015, it obtained an indictment charging both doctors with conspiracy to distribute controlled substances and conspiracy to commit healthcare fraud.  The charges partially overlapped with the allegations in Carver's *qui tam* complaint.  The government later obtained two superseding indictments, in October 2015 and April 2016, adding new defendants and new charges, including racketeering, Anti-Kickback Statute violations, wire fraud, and drug-distribution offenses.  These later indictments "partially overlapped with the allegations in Ms. Carver's *qui tam* action," but "also included charges based on unlawful prescribing practices, which were not alleged in the initial *qui tam* complaint."  *Id.*

The criminal case went to trial, and the jury convicted Couch of all charges, and Ruan of all but one.  Couch and Ruan both appealed.  Carver attempted to intervene in the criminal forfeiture proceedings, but the district court denied intervention, and we affirmed in October 2018.  *See Couch*, 906 F.3d at 1228–29.  Still, though, we observed that our ruling "will not disable Ms. Carver from getting her relator's share," accepting the government's assurances that a relator is entitled to a share of forfeited property "[w]here a defendant is found civilly liable for damages in a False Claim Act suit after being found criminally liable for the same fraud."  *Id.* at 1228–29.

C.  *Carver focuses solely on Castle, which then drops out of the case.*

Meanwhile, back in the *qui tam* case, in May 2017, the district court ordered Carver to show cause for her failure to seek entry of default against Couch, Ruan, the Clinic, and the Pharmacy. The court noted that these defendants had not responded to the complaint or appeared in the case despite being served with process. In response, Carver filed the necessary motions, and the clerk entered the respective defaults.

Unlike the other defendants, Castle appeared in the case and litigated in its defense. In October 2017, the district court granted Castle's motion for judgment on the pleadings, dismissing the claims against it.

Soon after, the district court ordered Carver to show cause why she had not moved for default judgment against the defaulted parties—the only remaining defendants at that time—and why the action should not be dismissed for failure to prosecute. Carver responded and moved for entry of default judgment under Rule 55(b), Fed. R. Civ. P. The government filed a notice indicating its interest in the proceeding and requesting a briefing schedule.

Before any hearing was held, the district court permitted Carver to file third and fourth amended complaints, in April 2018 and January 2019, respectively, revising the allegations and claims against Castle. Litigation between Carver and Castle continued until March 2020, when Castle's counsel withdrew from the case due to the company's insolvency, and Castle did not participate further.

*D. Carver seeks a relator's share of the criminal restitution.*

Turning back to the other defendants, specifically Couch and Ruan, Carver moved for discovery from the government on whether she was an "original source" for the criminal case and entitled to a relator's share of any funds recovered in that case, citing our decision in her forfeiture-intervention appeal. *See Couch*, 906 F.3d at 1228. In light of that request, the government moved to stay the proceedings pending the resolution of the criminal appeal.

The district court held multiple status hearings on these issues and the pending claims. At the first hearing in May 2019, the government asserted that it was premature to consider a relator's share before Carver had reduced the claims in her *qui tam* complaint to an enforceable judgment.

The government reiterated that stance at the next status hearing in November 2019. Counsel for the government explained that Carver first needed to "seek a judgment in the amount of the FCA damage that reasonably relates to her complaint" before getting into issues of her relator's share, noting that the criminal case was broader than the *qui tam* case.[1] In addition, counsel stated, the government had advised Carver's counsel several times of the procedures to seek information from the government on damages,

---

[1] The government readily admitted some overlap between the criminal case and the *qui tam* case, including "urine drug screens and the nurse practitioner billing," but it added that the restitution also included a "totally different scheme" that Carver "didn't know anything about."

such as Medicare claims data, but Carver "chose not to do that." The district court denied the motions for discovery and to stay.

The district court held a third status hearing in August 2020, after this Court resolved the direct criminal appeal, affirming on all but one count. *See United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020). Counsel for Carver described obtaining a default judgment as "a ministerial act" that could be easily done. In addition, her attorneys noted a disagreement with the government about the payout of funds recovered in the criminal case, emphasizing that they were reluctant to move forward if, at the end of the day, "the money is already gone" because it has been given to private victims. The government maintained that those issues were premature because Carver needed to obtain a judgment in the FCA case first. It also suggested "dismiss[ing] the action for failure to prosecute the case" if Carver did not remedy these defects, pointing out that she had been in control of the case for over four years.

Ultimately, the district court told Carver she needed to obtain a default judgment before it could reach issues relating to the calculation or collection of a relator's share. Carver indicated that she could obtain a default judgment "right now."

### E. Proceedings on the motion for default judgment

Following the hearing, Carver took steps to obtain a judgment in her *qui tam* case. She obtained an entry of default as to Couch and Ruan on the operative pleading. And then, in November 2020, she filed a motion for default judgment under Rule 55(b), Fed. R. Civ. P., seeking more than $60 million in total damages.

Relying solely on the operative indictment, the jury verdict, and the criminal judgment, Carver asserted that the sentencing orders "represent[ed] a judicial determination as to the amount Couch and Ruan are at a minimum liable." Carver asserted in a footnote that "there [wa]s substantial overlap between Mrs. Carver's complaints and the indictments in the criminal matter."

The government responded and again objected that Carver could not rely solely on the restitution figure because it included damages outside the scope of her pleadings. The government reiterated its position from the three status hearings that Carver was required to establish both liability and damages under the FCA based on the allegations raised in the *qui tam* case.

Status hearings in February 2021 and July 2021 yielded little progress. At the February hearing, it appears the district court approved some written discovery to explore the calculation of the criminal restitution amounts. Some information was exchanged, though not all that Carver requested. At the July 2021 hearing, the government advised that it was not opposed to a default judgment but that it wanted "that judgment to be able to hold water." It was Carver's job, the government stated, to do more than simply "rely[] on a number that has some connection but an obscure one at this point."

The district court agreed with the government that Carver still needed to explain how the restitution award "is the appropriate number for the claims that are alleged in [her] fourth amended complaint." [*Id.* at 13–15, 24, 26] With no objection from the

government, the court permitted Carver to depose a U.S. Attorney working on the related criminal case.

Then, in October 2021, Carver filed a motion to unseal the confidential information the government provided when it sought extensions of time as part of its initial investigation into Carver's allegations. The government opposed the motion and argued that Carver was deflecting from her obligation to prove damages.

*F. The government moves to intervene and dismiss the* qui tam *case.*

In a joint report filed in early 2022, the government observed that it was "analyzing how best to advance this case" since Carver appeared "no closer to obtaining a default judgment." For her part, Carver said she was "preparing a submission on the damages for entry of a final default judgment." But no submission was forthcoming in the ensuing months. Instead, Carver demanded additional information from the government and sought to take the depositions of various individuals.

On June 2, 2022, the government moved to intervene and to dismiss the action under 31 U.S.C. § 3730(c)(2)(A). Intervention and dismissal were warranted, the government asserted, for four reasons: Carver had "failed to prosecute this action to an enforceable judgment, neglected her responsibilities as a relator, burdened the United States with discovery requests that are either irrelevant or premature, and undercut the United States' FCA enforcement efforts in this district."

The government elaborated that, despite assuming control of the litigation in 2016, Carver had failed to move forward with

proving liability and damages as required to obtain a default judgment under Rule 55(b).  In the government's view, Carver "failed to develop a reliable damages methodology that accounted for the scope of the fraud alleged in the complaint" and instead attempted to piggyback on the criminal prosecution without doing the work to explain how the proof in the criminal case established the elements of her FCA claims.

The government further explained that Carver chose to proceed with the case despite being warned that it was speculative that the federal victims in the criminal case would ever receive any recovery in light of the "non-federal victims."  And then, the government continued, Carver "forced the United States to shoulder many of the burdens of participation in federal litigation" without any corresponding benefit, "namely a judgment in the United States' favor."  Instead of functioning on behalf of the government, it asserted, she had "acted to promote her own self-interest" by litigating premature issues regarding the disbursement of the restitution funds.

Nor did Carver's discovery submissions advance the case, according to the government.  Instead of attempting "to prove her own case," the government said, "Carver simply sought to have the United States do her work for her and asked the wrong questions to boot."  The government complained that Carver "filed requests for documents or information that essentially demand federal employees to prove her damages or develop a damages model for her."  And her "misguided efforts" relating to the criminal case

caused the government "to waste substantial assets" by attending status hearings, conducting numerous discussions with Carver's counsel, and "respond[ing] to multiple irrelevant or premature requests for documents or discovery." The government added that Carver's failure to prosecute the case in its name reflected poorly on its FCA enforcement efforts.

In conclusion, the government stated that, while it did not make the decision "lightly," it had "determined that the costs of continued litigation outweigh any benefits the United States could realistically obtain." Accordingly, the government asked the district court to dismiss the *qui tam* case with prejudice to Carver and without prejudice to the government.

Carver opposed the government's motion. She asserted that the claims were meritorious, given the criminal prosecution spawned by them, and that the government vastly overstated how burdensome the civil case had been and ignored that its own "attorneys continu[ed] to obstruct these proceedings unnecessarily and arbitrarily." She insisted she had been trying to get a default judgment, citing her recent discovery requests.

G.  *Many of the criminal convictions are vacated.*

Not long after Carver filed her response in opposition to intervention and dismissal, the Supreme Court reversed in the criminal cases, remanding for consideration of the proper *mens rea* standard for Couch and Ruan's drug convictions under 21 U.S.C. §

22-13608                Opinion of the Court                13

841(a).[2]  *See Ruan v. United States*, 142 S. Ct. 2370 (2022).  Then, on remand, we vacated the defendants' substantive drug convictions under § 841(a) but affirmed the remaining convictions.  *United States v. Ruan*, 56 F.4th 1291, 1298, 1302 (11th Cir. 2023).

H.  *The district court grants intervention and dismissal for the government.*

The district court held a status hearing, at which both parties agreed the motion to intervene and to dismiss was ripe for decision. Then the district court granted the government's motion.  Meanwhile, Carver had filed a motion to award damages and statutory penalties.

The district court concluded that the government was "entitled to the dismissal of this FCA action," having provided "compelling reasons to intervene and to dismiss this action that easily clear any threshold that might apply."  The court agreed with and adopted the government's reasoning, rejecting Carver's claims that the government was responsible for the deficiencies in the case.  Alternatively, the court found that dismissal would be appropriate for failure to prosecute.  Carver now appeals.

---

[2] Carver mistakenly asserts the government filed the motion to intervene and dismiss in response to the Supreme Court's decision in *Ruan*.  But in fact, the government filed its motion on June 2, 2022, several weeks before *Ruan* issued on June 27, 2022.

### III. The *Polansky* Decision

After briefing in this case was complete, the Supreme Court in *Polanksy* addressed the government's intervention and dismissal authority in *qui tam* cases. As we've noted, in *qui tam* cases the government may elect to intervene early on. 31 U.S.C. § 3730(b)(2)–(3). Or the court may "permit the [g]overnment to intervene at a later date upon a showing of good cause." *Id.* § 3730(c)(3).

The Court in *Polanksy* held that, if the district court permits intervention under § 3730(c)(3), the government "becomes a party" and, accordingly, "assumes primary responsibility for the case's prosecution." 143 S. Ct. at 1732 (cleaned up). That responsibility includes the unilateral "right to dismiss" under § 3730(c)(2)(A).[3] *Id.* Thus, "Congress enabled the [g]overnment, in the protection of its own interests, to reassess *qui tam* actions and change its mind" with no loss to its rights. *Id.* at 1733. That's because "[t]he suit remains, as it was in the seal period, one to vindicate the [g]overnment's interests." *Id.*

The Court next addressed the appropriate standard for courts to use when the government, after intervention, seeks dismissal of an FCA action over a relator's objection. *See id.* at 1733. Finding no reason to depart from the default rules of civil procedure, the Court held that the appropriate standard derives from Federal Rule 41(a), which governs voluntary dismissal in ordinary

---

[3] *Polansky* held that the government must intervene before exercising the right to dismiss under § 3730(c)(2)(A). *United States ex rel. Polansky v. Exec. Health Res.* 143 S. Ct. 1720, 1730–31 (2023). The government did so here.

civil litigation. *Id.* So "[a] district court should assess a [§ 3730(c)(2)(A)] motion to dismiss using Rule 41's standards." *Id.* "And in most FCA cases," *Polansky* states, "those standards will be readily satisfied." *Id.*

The Rule 41 inquiry "is necessarily contextual." *Id.* at 1734. A district court should consider the interests of the relator, who may "have by then committed substantial resources." *Id.* But "in this context, the [g]overnment's views are entitled to substantial deference." *Id.* A *qui tam* suit, after all, "is on behalf of and in the name of the [g]overnment" and "alleges injury to the [g]overnment alone." *Id.* So "[i]f the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion[,] . . . even if the relator presents a credible assessment to the contrary." *Id.* A district court's order under Rule 41 is reviewable for an abuse of discretion. *Id.* at 1735.

Conducting the Rule 41 inquiry in *Polanksy*, the Supreme Court found that the government "gave good grounds for thinking that this suit would not do what all *qui tam* actions are supposed to do: vindicate the Government's interests." *Id.* The government's motion to dismiss, the Court explained, "enumerated the significant costs of future discovery in the suit, including the possible disclosure of privileged documents," and "explained in detail why it had come to believe that the suit had little chance of success on the merits." *Id.* Although the relator "vigorously disputed the latter point," that competing assessment did not "outweigh the [g]overnment's reasonable view of the suit's costs and benefits." *Id.*

"Absent some extraordinary circumstances," the Court said, that's enough for the government to prevail on a § 3730(c)(2)(A) motion to dismiss. *Id.*

## IV. Discussion

"Dismissal on motion of the plaintiff pursuant to Rule 41(a)(2) is within the sound discretion of the district court, and its order may be reviewed only for an abuse of discretion." *McCants v. Ford Motor Co., Inc.*, 781 F.2d 855, 857 (11th Cir. 1986). Under this standard, we must affirm unless the court relied on clearly erroneous facts, applied the wrong legal standard, or made a clear error of judgment. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1222 (11th Cir. 2017).

Here, the district court did not abuse its discretion by granting the government's motion to dismiss under § 3730(c)(2)(A).[4] As in *Polansky*, the government in this case "gave good grounds for thinking that this suit would not do what all *qui tam* actions are supposed to do: vindicate the [g]overnment's interests." 143 S. Ct. at 1735.

To begin with, the record amply supports the government's charge that Carver failed to meaningfully prosecute the *qui tam* action and obtain a judgment in favor of the government. Despite controlling the civil litigation since 2016, and despite repeated

---

[4] Carver does not raise a separate challenge to the district court's decision to permit intervention. In any case, the same grounds that support dismissal also provide good cause to intervene under 31 U.S.C. § 3730(c)(3).

prompting by the government and the district court, Carver had made little progress on obtaining a judgment by the time the government moved to intervene in 2022. She pursued only certain defendants at certain times and, when she eventually attempted to move for default judgment as to Couch and Ruan, she failed to set forth or support a fair assessment of the government's damages for the violations alleged in her *qui tam* complaint.

Instead of pursuing a civil judgment first, a prerequisite to any relator's recovery under the FCA, *see* 31 U.S.C. § 3730(d)(2), Carver focused on irrelevant or premature issues related to the criminal case. She sought to adopt the criminal restitution figures as her civil damages without any effort to tailor them, even though it's undisputed that the restitution included losses from schemes that were not included in the *qui tam* case. *See Couch*, 906 F.3d at 1226. She also raised, and demanded information about, issues that were premature, such as the extent of her relator's share or her ability to collect in the face of other claimants to the restitution.

Carver justified this course of action with our decision in *Couch*, noting that we preserved her right to seek a relator's share from funds recovered in the criminal case. *See id.* at 1228–29. But nothing we said in *Couch* excused Carver from going through the ordinary process of obtaining a judgment in the FCA case before seeking a relator's share. *See id.* (indicating that a *qui tam* plaintiff may collect a relator's share from restitution "[w]here a defendant is *found civilly liable for damages in a False Claims Act suit* after being found criminally liable for the same fraud" (emphasis added)); *see*

*also Polansky*, 143 S. Ct. at 1720 (*"If the [FCA] action leads to a recovery*, the relator may receive up to 30% of the total."*).

Not only that, but when Carver did eventually turn to offering proof of damages in the civil case, she largely "sought to have the United States do her work for her," as the government observed. She was not denied a fair opportunity to prove her case. The record shows that, no later than 2019, the government informed Carver how to request claims data to support her allegations, and otherwise tried to steer her towards obtaining a default judgment that would "hold water" and be of value to the government. But Carver made no discernible effort along those lines until 2022, around the same time the government moved to intervene and dismiss. And even then, her discovery requests essentially asked government employees to put dollar values on her claims. The government reasonably could have assessed that ongoing litigation would further involve the government and its resources in a case it had declined to prosecute and continued to view as unlikely to lead to any realistic recovery.

Here, the government did more than enough to establish reasonable grounds for its view that "the burdens of continued litigation outweigh its benefits." *Polansky*, 143 S. Ct. at 1734. We see nothing to suggest that the government, in seeking intervention and dismissal, acted arbitrarily or for reasons unrelated to its legitimate interests. Although Carver may have spent considerable resources along the way, this is not an "exceptional case" where the

government's motion to dismiss under § 3730(c)(2)(A) fails to satisfy Rule 41's standards. *See id.* at 1734–35.

Accordingly, the district court properly granted the government's motion to dismiss. We affirm.

**AFFIRMED.**