[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12461

_____

J.C. PENNEY CORPORATION, INC.,

Plaintiff-Counter Defendant-Appellee,

*versus*

OXFORD MALL, LLC,

Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:19-cv-00560-KOB

_____

Before GRANT, ABUDU, and ED CARNES, Circuit Judges.

GRANT, CIRCUIT JUDGE:

A limited liability company named Oxford Mall fought J.C. Penney in federal court for over two years. Just when it was poised to lose the case, Oxford informed the court that it lacked subject-matter jurisdiction over the lawsuit. The court issued sanctions, ordering Oxford to pay part of J.C. Penney's wasted attorney's fees. But Oxford was not finished yet. When the district court asked the parties for briefing on the appropriate amount of fees, Oxford added an affidavit explaining why sanctions were not appropriate. The district court struck the affidavit and awarded J.C. Penney two-thirds of its requested fees. Oxford challenges both decisions as abuses of discretion. We emphatically affirm.

**I.**

In a 2017 foreclosure sale, Oxford Mall, LLC, purchased the Quintard Mall Shopping Center and subsequently entered into a significant redevelopment plan with the local government. Acting on this agreement, Oxford renovated the mall's interior and razed what had been an old Sears store in anticipation of new, more inviting construction. More development was yet to come, but all was not well behind the storefronts.

Enter J.C. Penney Corporation, Inc., a fixture at the mall since 1968. As an inducement to set up shop, J.C. Penney's lease included the right to approve certain changes to the mall's site plan, as well as options to extend the lease's term. Decades after that initial agreement, and years after the mall changed hands, J.C. Penney sought to exercise one of its remaining contractual options.

But just three days after agreeing to redevelop the mall, Oxford denied that request, claiming that J.C. Penney was out of extension options. Whether that was true was crucial for the redevelopment plans—if J.C. Penney's lease was still in effect, Oxford would need its approval to redevelop certain parts of the mall. If not, the renovations could move forward unimpeded.

J.C. Penney filed this lawsuit in April 2019, invoking the district court's diversity jurisdiction. For federal diversity jurisdiction to attach, all parties must be completely diverse. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806). Oxford Mall did not contest jurisdiction in its answer to the complaint— and even pleaded diversity jurisdiction in its counterclaim. Both parties took the position that the court had diversity jurisdiction, but Oxford's LLC ownership structure made it a complex question. A limited liability company or a limited partnership has the citizenship of each one of its members. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1021–22 (11th Cir. 2004). And because members of an LLC are often themselves LLCs or LPs, the citizenship inquiry can balloon at each step.

J.C. Penney is a citizen of Delaware and Texas. So diversity jurisdiction is defeated if any member of Oxford Mall, LLC, is a citizen of Delaware or Texas. And if any of those members were LLCs or LPs, the same rule would apply for the members of those members, and so on. These requirements were met according to both parties' pleadings, and for the next two years, the lawsuit proceeded with the understanding that jurisdiction existed.

In the meantime, a second dispute popped up. Hibbett Sporting Goods—another tenant—sued Oxford in August 2019, seeking a declaration of its right to extend its lease term. Like J.C. Penney, Hibbett asserted diversity jurisdiction. This time, though, Oxford and its attorney Wayne Grovenstein[1] immediately began seeking information that would strip the court of jurisdiction over the case. In one email to a member of Oxford, Eightfold Opportunity Fund II, LP, Grovenstein accurately explained how to determine diversity jurisdiction for Oxford. He emphasized that if Eightfold was a citizen of Alabama, federal jurisdiction would be unavailable and the *Hibbett* suit would move to state court—a better forum from the partnership's perspective. "Likewise for J.C. Penney," he went on, "if one or more of the members is a Texas or Delaware resident, then we may be able to relocate their lawsuit to Georgia." The same outreach was repeated throughout Oxford's ownership chain, but without immediate success in identifying a non-diverse person or entity that could shift either suit to state court.

Those efforts trailed off in late 2019 for unknown reasons—until January 2020, that is, when the *Hibbett* court ordered Oxford to disclose the identity of all of its members and their states of citizenship. At this point, Grovenstein reached back out to Eightfold. Explaining his renewed interest, Grovenstein wrote that he assumed that the judge did "not want to spend time on a

---

[1] Grovenstein is general counsel for Oxford's property manager, Hull Property Group, LLC.

diversity action for which diversity jurisdictions [sic] does not actually exist," just to "have the proceedings vacated at some later date."

The revived efforts paid off. On January 28, 2020, Eightfold identified a Delaware citizen in its ownership chain, refuting Hibbett's assertion of diversity jurisdiction. The very next day, Oxford filed a complaint against Hibbett in Georgia state court. And thirty-six days after that, it filed a motion to dismiss the federal *Hibbett* case for lack of jurisdiction. That was March 5, 2020.

For the *J.C. Penney* case, however, there was no such filing—Oxford continued to actively litigate in federal court. Briefing on the parties' cross-motions for summary judgment was completed just six days before Oxford learned that it was a Delaware citizen—one of J.C. Penney's states of citizenship. Oxford did not follow up with the court. A few months later, when the district court stayed the case in light of J.C. Penney's bankruptcy petition, Oxford remained silent. Litigation resumed after J.C. Penney agreed to relinquish the right to have the claims heard in bankruptcy court. Still, no one told the court. The stay was lifted on August 7, 2020—more than six months after Oxford learned it was a Delaware citizen. Still no word. With nothing standing in the way (that it knew of), the district court turned to the merits. On August 27, it granted J.C. Penney's motion for partial summary judgment and denied Oxford's motion in full. Still no word.

Dissatisfied with that outcome, Oxford filed a motion for reconsideration. Still no mention of the jurisdictional problem.

Over the next two months, the parties briefed the motion and the district court again ruled in favor of J.C. Penney on November 24, 2020. Still no word. Following that ruling, Oxford and J.C. Penney jointly asked the district court to stay the case once more, this time for mediation. Still—no word. Mediation was held on March 31, 2021, more than fourteen months after Oxford learned it was a Delaware resident. The parties could not come to an agreement, and they informed the district court of that fact on April 14. Oxford Mall—still—informed neither J.C. Penney nor the court about the lack of jurisdiction. The court scheduled a status conference for April 28, 2021.

Exactly one week later—five days before the scheduled conference and fifteen months after learning that both parties in the case were citizens of Delaware—Oxford filed a motion to dismiss for lack of subject-matter jurisdiction, finally informing the court of the lack of diversity. The district court immediately stayed all proceedings. For its part, J.C. Penney moved for sanctions under Federal Rule of Civil Procedure 37 and the court's inherent powers. The court granted Oxford's motion to dismiss, but retained jurisdiction over J.C. Penney's motion for sanctions.

After briefing and a hearing on the matter, the court agreed to issue sanctions under its inherent powers (but not Rule 37), instructed J.C. Penney to outline its fees, and asked Oxford to brief the reasonableness of that amount. Oxford filed a brief as requested. But it also added an affidavit from its attorney, Grovenstein, who asserted that Oxford Mall had not intentionally

misled the court.  The district court was unmoved, and it struck the affidavit as untimely and irrelevant.  After yet another round of briefing, the court awarded J.C. Penney $62,556 in attorney's fees—two-thirds of the amount that it incurred after Oxford learned the diversity-destroying information—and another $558.05 in costs.  This is Oxford Mall, LLC's appeal from both rulings.

## II.

This Court reviews sanctions orders for abuse of discretion. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1222 (11th Cir. 2017).  And because a finding of bad faith is a finding of fact, we review it for clear error.  *DeLauro v. Porto (In re Porto)*, 645 F.3d 1294, 1304 (11th Cir. 2011); *accord Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023).  We also review a district court's ruling on the admissibility of evidence, including a decision to strike an affidavit, for abuse of discretion. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249, 1252 (11th Cir. 2007); *Useden v. Acker*, 947 F.2d 1563, 1571–72 (11th Cir. 1991).

## III.

The inherent powers of the federal courts include the authority to fashion sanctions for conduct that abuses the judicial process.  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017).  This power's "dual purpose" is "to vindicate judicial authority" and "to make the prevailing party whole." *Purchasing Power*, 851 F.3d at 1223.  The "key to unlocking" that power is a finding of bad faith.  *Id.*  But a blank conclusion that a party acted in bad faith is not enough; the court instead needs to make specific

findings about which conduct justifies sanctions. *DeLauro*, 645 F.3d at 1304. And those findings must show "subjective bad faith," meaning intentional and not just reckless behavior. *Purchasing Power*, 851 F.3d at 1224–25. Still, that intent can be inferred "if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id.*

Just so here, where the district court made a series of specific factual findings about why Oxford's actions were in bad faith. *First*, on January 28, 2020, Oxford had actual knowledge that it, like J.C. Penney, was a citizen of Delaware, which destroyed the court's diversity jurisdiction. *Next*, the district court found that Oxford properly understood the relevant law—a conclusion made necessary by Oxford's surprising argument that because Grovenstein was a transactional lawyer, it was "imminently plausible" that he did not recognize the relevance of shared citizenship. That is absolute nonsense. Grovenstein was in charge of Oxford's effort to establish its citizenship, and his emails reflect that he full well knew the effect of shared citizenship on diversity jurisdiction. Oxford's contention that it did not consider the connection between its two tenant disputes at the same property until after mediation was disproven by attorney Grovenstein's own September 2019 email spelling out the implications of the *Hibbett* jurisdictional inquiry to the *J.C. Penney* litigation.

*Finally*, the district court found that Oxford's delay in disclosing the lack of diversity jurisdiction was strategic; it waited until April 2021—15 months and several unfavorable rulings later.

This evidence, the court concluded, showed that the conduct was "so egregious that Oxford Mall could only have committed it in bad faith." We cannot disagree; Oxford Mall's wrongdoing here is startling in its obviousness. But even if we were less certain, when "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). The district court's determination of bad faith is far more than "plausible in light of the entire record," and we do not disturb it. *See id.*

Oxford, however, protests that sanctions are not appropriate because bad faith is not the *only* plausible explanation for its actions. But that argument misunderstands the standard. Requiring the district court to rule out all other "plausible" explanations would be tantamount to requiring proof beyond a reasonable doubt—a bar even Oxford admits is too high.[2] The district court, in short, did not abuse its "broad discretion" in deciding whether to impose sanctions. *Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010).

---

[2] We need not decide today whether district courts should use a preponderance standard or a clear-and-convincing standard. The district court applied the clear-and-convincing standard "out of an abundance of caution," and neither party challenges that decision on appeal.

**IV.**

Oxford also argues that even if it did act in bad faith, the district court's sanction award was too high.  Again, we disagree.

When a court uses its inherent authority to award a sanction in the form of attorney's fees, legal fees awarded "must be compensatory rather than punitive"—at least in civil litigation. *Goodyear*, 581 U.S. at 108.  Because the purpose of this fee-shifting mechanism is to reimburse the victim, a causal connection is required between the fees awarded and the sanctioned party's misconduct.  *Id.* at 108–09.  So the complaining party may only recover those fees it would not have incurred "but for" its opponent's misconduct.  *Id.* at 109 (quotation omitted).

Under this approach, the court's "fundamental job" is to decide whether a legal fee would have existed even without the sanctioned conduct.  *Id.* at 110.  This sometimes means evaluating each specific litigation expense—but not always.  *Id.* at 109.  The Supreme Court has been careful to avoid turning judges into auditors: courts assessing fees "need not, and indeed should not, become green-eyeshade accountants."  *Id.* at 110 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).  So "rough justice" is the aim, not "auditing perfection."  *Id.* (quotation omitted).

Along these lines, a district court may consider "its overall sense of [the] suit" and "use estimates in calculating and allocating an attorney's time."  *Id.* (alteration adopted) (quotation omitted). It could decide, for example, that "all (or a set percentage) of a particular category of expenses" satisfy the standard.  *Id.*  In

"exceptional cases," the court could even award all fees incurred after some significant event during the litigation. *Id.* As for our standard of review on appeal, the district court's judgment is "entitled to substantial deference" in light of its "superior understanding of the litigation." *Id.* (quotation omitted).

The district court here complied with these standards. Its starting point was the amount of fees that J.C. Penney incurred after March 5, 2020—the date Oxford moved to dismiss the *Hibbett* case for lack of subject-matter jurisdiction. After all, "J.C. Penney would not have litigated any matters in this case after March 2020, 'but-for' Oxford Mall's bad faith."

That was not the only limitation. The district court offered two reasons for not awarding J.C. Penney all of its fees starting on that date. For one, "J.C. Penney's efforts to litigate this case since March 2020 were not *entirely* wasted" because it was able to make "use of its arguments from this case in the state court proceeding." So awarding all of its fees from the relevant time period would "overcompensate J.C. Penney, rather than 'making it whole.'" On top of that, the district court placed at least some part of the blame on J.C. Penney for not working harder to discover the jurisdictional defect itself.

For these reasons, the district court limited its sanction award to two-thirds of J.C. Penney's incurred attorney's fees after Oxford discovered its Delaware citizenship.[3] Oxford argues that

---

[3] We reject the argument that because the limitation had a dual purpose— both avoiding an award for fees that J.C. Penney would have incurred anyway

the district court erred by not "'assessing and allocating specific litigation expenses' as the but-for standard 'demands.'" But there is no such "demand." Oxford's suggestion to the contrary ignores *Goodyear*'s explicit qualifications of the general approach it outlined. The Supreme Court went out of its way to caution that district courts need not parse every single litigation expense with a fine-tooth comb. *Goodyear*, 581 U.S. at 110. Here, the district court considered its "overall sense of [the] suit," "use[d] estimates," and concluded that "a set percentage" (two-thirds) "of a particular category of expenses" (those incurred after Oxford should have dismissed the case) were "incurred solely because of [Oxford's] bad-faith conduct." *Id.* We owe this judgment substantial deference on appeal. *Id.*

Ultimately, Oxford cries foul about the district court shifting fees in a manner explicitly blessed by the Supreme Court. We reject its attempt to characterize the district court's action as anything else. The district court did not abuse its considerable discretion in determining the amount of fees owed to J.C. Penney.[4]

---

and accounting for J.C. Penney's responsibility—it did not independently satisfy either one.

[4] Oxford also argues that the district court erred by refusing to apply the "excess costs" framework from *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230 (11th Cir. 2007). But *Amlong* only analyzed the permissibility of sanctions under 28 U.S.C. § 1927. 500 F.3d at 1239–42. And this Court has previously admonished lower courts for "blurr[ing] the lines between the inherent power standard and the standard used for Rule 11 and § 1927 sanctions." *Purchasing Power*, 851 F.3d at 1223 n.4. "While these powers can be used to punish the

## V.

We also conclude that the district court did not abuse its discretion when it *sua sponte* struck Oxford's affidavit as untimely and irrelevant.

On June 24, 2021, after both parties had moved for sanctions, the district court ordered reply briefs to be filed no later than July 6, with a hearing twenty days later on whether the court should impose sanctions. Both parties complied with the filing deadline, and the court held the hearing. On August 5, it granted J.C. Penney's motion in part and imposed sanctions on Oxford.

Though the court had decided that sanctions were in order, the amount was not yet determined. So the court's next order directed J.C. Penney to outline its legal fees and Oxford to brief the reasonableness of those amounts. Seeing an opportunity, Oxford filed an affidavit from its attorney, Grovenstein, in addition to its brief. But this affidavit did not mention J.C. Penney's fees at all, let alone the reasonableness of those fees. Instead, it contained a protracted merits discussion of how Grovenstein (and by extension, Oxford) did not act in bad faith. The district court refused to consider it. The affidavit, the court concluded, bore "only on whether the court should impose sanctions *at all*—not the *amount* of fees," which was the only issue pending at the time.

---

same areas of conduct, they are not governed by the same standard." *Id.* The district court did not err by refusing to apply an incorrect standard.

We see no problem—a district court is not required to consider irrelevant evidence. *Cf. United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981).[5] Because Grovenstein's affidavit had nothing to do with the amount of fees recoverable, the district court had no reason to assess it.

What's more, even if the affidavit had been relevant, it was untimely. The Federal Rules of Civil Procedure provide that "any opposing affidavit must be served at least 7 days before the hearing," unless the court allows otherwise. Fed. R. Civ. P. 6(c)(2). Oxford did not file Grovenstein's affidavit until August 19, 2021—forty-four days after its pre-hearing briefing deadline and twenty-four days after the sanctions hearing. "Absent an affirmative showing by the non-moving party of excusable neglect," a "court does not abuse its discretion in refusing to accept out-of-time affidavits." *Useden*, 947 F.2d at 1571 (quotation omitted). Oxford made no such showing here. In fact, it did not even argue for excusable neglect, admitting at oral argument that not filing sooner was a "strategic decision."

No matter how Oxford tries to reframe the issue, the district court's refusal to allow the overdue and irrelevant affidavit to function as the equivalent of a motion for reconsideration was not an abuse of discretion.

---

[5] Decisions by the former Fifth Circuit handed down before October 1, 1981, are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

⋆    ⋆    ⋆

This case offers a textbook example of bad faith. Undeterred after discovering that the district court lacked jurisdiction, Oxford decided to withhold that fact and try its hand at the merits. When those merits efforts failed, Oxford pulled out the diversity-destroying card. And when jurisdiction vanished, so did all the unfavorable rulings. We do not take this kind of jurisdictional manipulation lightly. We therefore **AFFIRM** the award of sanctions.